# UNITED STATES *v.* FERGER ET AL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 776.  Argued April 29, 1919.—Decided June 2, 1919.

Under the commerce clause, Congress has power to deal with acts not in themselves interstate commerce but which obstruct or otherwise injuriously affect it.  P. 202.

Bills of lading in interstate commerce are instrumentalities of that commerce, subject to the authority of Congress under the commerce clause.  P. 204.

Judicial notice will be taken of the importance of bills of lading in interstate commerce.  *Id.*

Congress has power to prohibit and punish the forgery and utterance of bills of lading for fictitious shipments in interstate commerce, as a means of protecting and sustaining that commerce.  P. 205.

256 Fed. Rep. 388, reversed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Brown,* with whom *Mr. Charles H. Weston* was on the brief, for the United States.

*Mr. Charles E. Hughes*, with whom *Mr. John C. Hermann* and *Mr. Sherman T. McPherson* were on the brief, for defendants in error.

*Mr. Francis B. James*, by leave of court, filed a brief on behalf of the National Industrial Traffic League, as *amicus curiæ*.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The twenty-four counts of the indictment in this case were concerned with the commission of acts defined as criminal and punished by the 41st section of the Act of August 29, 1916, entitled, "An Act Relating to bills of lading in interstate and foreign commerce." (39 Stat. 538.)

In the first count it was charged that the accused, in violation of the section, on or about the 14th day of August, 1917, in Cincinnati, Ohio,—"did . . . feloniously, and with intent to defraud, falsely make, forge and counterfeit, and aid and assist in falsely making, forging, and counterfeiting a certain bill of lading purporting to represent goods received at Fountaintown, in the State of Indiana, for shipment to Cincinnati, in the State of Ohio, and to utter and publish and aid and assist in uttering and publishing such falsely made, forged, and counterfeited bill of lading, then and there knowing the same to be falsely made, forged, and counterfeited. . . ."

A copy of the fabricated bill of lading was reproduced in the count. It was negotiable in form, following the standard approved by the Interstate Commerce Commission (Docket No. 787, June 27, 1908). The bill acknowledged the receipt by the Cincinnati, Hamilton and Dayton Railway Company of corn in bulk at a designated place in Indiana, shipped to Cincinnati to the order of the shipper, and with directions to notify a person named. It contained all the

earmarks which would have been found in a genuine bill of lading.

The second count charged the knowing, wilful and fe-lonious uttering of the bill of lading and, with criminal intent and knowledge, obtaining money on it from the Second National Bank of Cincinnati by using it as collateral.

These first two counts are types of the remaining twenty-two, except that the latter dealt with eleven other bills of lading as to each of which there were two counts, charging in the exact words used in the first and second counts, on the one hand the felonious fabricating and uttering of a bill of lading, and on the other hand the uttering and obtaining on the same bill of money from the Second National Bank of Cincinnati.

There was a motion to quash all the counts based upon alleged defects in pleading with which we are not concerned, and by demurrer the failure of the indictment to charge an offense was asserted on these grounds:

"First. That said act of Congress . . . approved August 29, 1916, is unconstitutional and void, especially section 41 of said act in so far as it attempts to make it a crime and punish any person who forges or counterfeits a bill of lading where no shipment from one State to another is made or intended.

"Second. That said act can only apply to bills of lading representing actual shipments of merchandise or commerce between the States. If it is intended to apply to wholly fictitious shipments, it is unconstitutional and void so far as said fictitious shipments are concerned, because the power of Congress to legislate upon this subject matter is based wholly and solely upon the commercial clause of the Constitution, and if there is no commerce, there is no jurisdiction."

The demurrer was sustained and all the counts in the indictment were dismissed. The court said:

"It was agreed at the argument and assumed in the briefs of counsel that the so-called bills of lading were fictitious, in that there was no actual consignor or consignee, and that they did not relate to any shipment or contemplated shipment of corn whatsoever. This fact so agreed upon in open court is to be read into the indictments."

Dealing with the case thus made, the court observed:

"These bogus bills of lading were nothing but pieces of paper, fraudulently inscribed to represent a real contract between real people and the actual receipt of goods for interstate shipment. . . . That they were inscribed so as to purport to relate to interstate shipments was nothing else than a fraud upon such persons as innocently took them, as collateral or otherwise. The execution of them and their use for obtaining money under false pretenses was nothing other than a crime of the kind cognizable by the criminal legislation of the States, and a matter with which the Congress, in the exercise of its power to regulate commerce, is not concerned."

And upon these premises, after reviewing what were deemed to be the controlling authorities, it was concluded that the case "must be decided in favor of the defendants, and the holding made that Congress has not the power, under the commerce clause, to prescribe a punishment under the circumstances of this case, and if the Congress has sought to do so, the attempt is futile, because without authority."

Despite the hypothetical form in which this conclusion is expressed, the context of the opinion makes it certain that, reading the facts charged in the indictment in the light of the admissions made at the argument, the court construed the section of the statute as embracing such acts and decided that as thus construed it was void for repugnancy to the Constitution.

At the outset confusion in considering the issue may result unless obscurity begotten by the form in which the

contention is stated be dispelled. Thus both in the plead-
ings and in the contention as summarized by the court
below it is insisted that as there was and could be no
commerce in a fraudulent and fictitious bill of lading,
therefore the power of Congress to regulate commerce
could not embrace such pretended bill. But this mistak-
enly assumes that the power of Congress is to be necessa-
rily tested by the intrinsic existence of commerce in the
particular subject dealt with, instead of by the relation of
that subject to commerce and its effect upon it. We say
mistakenly assumes, because we think it clear that if the
proposition were sustained it would destroy the power of
Congress to regulate, as obviously that power, if it is to
exist, must include the authority to deal with obstructions
to interstate commerce (*In re Debs*, 158 U. S. 564) and with
a host of other acts which, because of their relation to and
influence upon interstate commerce, come within the
power of Congress to regulate, although they are not
interstate commerce in and of themselves. It would be
superfluous to refer to the authorities which from the foun-
dation of the Government have measured the exertion by
Congress of its power to regulate commerce by the prin-
ciple just stated, since the doctrine is elementary and is
but an expression of the text of the Constitution. Art. I,
§ 8, clause 18. A case dealing with a somewhat different
exercise of power, but affording a good illustration of the
application of the principle to the subject in hand, is
*First National Bank* v. *Union Trust Co.*, 244 U. S. 416.

Although some of the forms of expression used in the
opinion below might serve to indicate that the error just
referred to had found lodgment in the mind of the court,
the context of the opinion makes it certain that such was
not the case, since the court left no obscurity in its state-
ment of the issue which it decided, saying "They [the fic-
titious bills of lading] did not affect interstate commerce,
directly or indirectly; they did not obstruct it or interfere

with it in any manner, and had nothing whatsoever to do with it, or with any existing instrumentality of it."

This statement not only clearly and accurately shows the question decided, but also with precision and directness points out the single and simple question which we must consider and dispose of in order to determine whether the court below erred in holding that the authority of Congress to regulate commerce did not embrace the power to forbid and punish the fraudulent fabrication and use of fictitious interstate bills of lading.

That bills of lading for the movement of interstate commerce are instrumentalities of that commerce which Congress under its power to regulate commerce has the authority to deal with and provide for is too clear for anything but statement, as manifested not only by that which is concluded by prior decisions, but also by the exertion of the power by Congress. Nothing could better illustrate this latter view than do the general provisions of the act, the 41st section of which is before us. See also Act of June 29, 1906, c. 3591, § 7, 34 Stat. 584, 593; Act of June 18, 1910, c. 309, 36 Stat. 539, 546; *Almy* v. *California*, 24 How. 169; *Thames & Mersey Marine Insurance Co.* v. *United States*, 237 U. S. 19, 26; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Harold*, 241 U. S. 371, 378; *Luckenbach* v. *McCahan Sugar Refining Co.*, 248 U. S. 139; *Missouri, Kansas & Texas Ry. Co.* v. *Sealy*, 248 U. S. 363. That as instrumentalities of interstate commerce, bills of lading are the efficient means of credit resorted to for the purpose of securing and fructifying the flow of a vast volume of interstate commerce upon which the commercial intercourse of the country, both domestic and foreign, largely depends, is a matter of common knowledge as to the course of business of which we may take judicial notice. Indeed, that such bills of lading and the faith and credit given to their genuineness and the value they represent are the producing and sustaining causes of the enormous number

of transactions in domestic and foreign exchange, is also so certain and well known that we may notice it without proof.

With this situation in mind the question therefore is, Was the court below right in holding that Congress had no power to prohibit and punish the fraudulent making of spurious interstate bills of lading as a means of protecting and sustaining the vast volume of interstate commerce operating and moving in reliance upon genuine bills? To state the question is to manifest the error which the court committed, unless that view is overcome by the reasoning by which the conclusion below was sought to be sustained. What was that reasoning? That the bills were but "pieces of paper, fraudulently inscribed" and "did not affect interstate commerce, directly or indirectly . . . and had nothing whatsoever to do with it, or with any existing instrumentality of it." But this rests upon the unsustainable assumption that the undoubted power which existed to regulate the instrumentality, the genuine bill, did not give any power to prevent the fraudulent and spurious imitation. It proceeds further, as we have already shown, upon the erroneous theory that the credit and confidence which sustains interstate commerce would not be impaired or weakened by the unrestrained right to fabricate and circulate spurious bills of lading apparently concerning such commerce. Nor is the situation helped by saying that as the manufacture and use of the spurious interstate commerce bills of lading were local, therefore the power to deal with them was exclusively local, since the proposition disregards the fact that the spurious bills were in the form of interstate commerce bills which in and of themselves involved the potentiality of fraud as far-reaching and all-embracing as the flow of the channels of interstate commerce in which it was contemplated the fraudulent bills would circulate. As the power to regulate the instrumentality was coextensive with interstate com-

merce, so it must be, if the authority to regulate is not to be denied, that the right to exert such authority for the purpose of guarding against the injury which would result from the making and use of spurious imitations of the instrumentality must be equally extensive.

We fail to understand the danger to the powers of government of the several States which it is suggested must arise from sustaining the validity of the provisions of the act of Congress in question. On the contrary, we are of opinion that to deny the power asserted would be to depart from the text of the Constitution and to overthrow principles of interpretation which, as we have seen, have been settled since *McCulloch* v. *Maryland*, 4 Wheat. 316, and which in application have never been deviated from.

This conclusion remains unshaken despite an examination of the decided cases cited by the court below in its opinion or which were pressed upon our attention in argument, since in our judgment they all but express the general principles of interpretation which we have applied and which are decisive against the contention of want of power in Congress which was upheld below and is here insisted upon.

It follows that the judgment below was wrong. It must therefore be reversed and the case be remanded for further proceedings in conformity with this opinion.

*And it is so ordered.*

MR. JUSTICE PITNEY dissents.