### UNITED STATES v. LIETO et al.
#### No. 7926.

District Court, N. D. Texas, Dallas Division.

Feb. 16, 1934.

La Vergne F. Guinn, of Dallas, Tex., and Louis Titus and Quinn Shaugnessy, both of Washington, D. C., for the United States.

Wm. Madden Hill, Olin M. Street, and T. L. Wheeler, all of Dallas, Tex., for defendant Bob Lieto.

Howard Dailey, Joe M. Hill, Lee Perkinson, Parker V. Lucas, and Matthaei & Hill, all of Dallas, Tex., for other defendants.

ATWELL, District Judge.

There are three of these informations. They are numbered, respectively, 7926, 7927, and 7928.

They are based on the National Industrial Recovery Act, 48 Stat. 195, the first section of. which provides that: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce * * * is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof. * * *" 15 USCA § 701.

Section 2 of the act (15 USCA § 702) empowers administrative agencies to effectuate the policy of the title, to wit, national industrial recovery. To that end the President is authorized to establish such agencies and to accept and utilize such voluntary and uncompensated services, to appoint, without regard to the provisions of the civil service laws, such officers and employees, and to utilize such federal officers and employees, and with the consent of the state, such state and local officers and employees, as he may find necessary; to prescribe their authorities, duties, responsibilities, and tenure, and, without regard to the Classification Act of 1923 (5 USCA § 661 et seq.), as amended, to fix the compensation of any officers and employees so appointed. The President may delegate any

of his functions and powers under this title. Then follow provisions for the fixing of codes under which industrial associations and groups must function. Such codes may be voluntarily entered into or may be formulated by the President.

When a code of fair competition has been approved or prescribed by the President under this title, any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor, and, upon conviction thereof, an offender shall be fined not more than $500 for each offense, but each day such violation continues shall be deemed a separate offense.

A code for the petroleum industry that was approved on August 13, 1933, was somewhat modified on September 13, 1933. It is divided into seven articles. Article 5 has a number of subdivisions which deal with marketing, etc.

Under these provisions, these prosecutions were instituted, by information, which contains four counts. The first count charges that during the week of November 18, 1933, in the city of Dallas, the defendant operated a service station as a merchant and vendor, selling to the public, at retail, petroleum products, to wit, motor fuels, motor lubricants, and motor gasoline; that during that period one Charles Burkley was an employee of the defendant at that station; that the defendant, on the 11th of the said month of the same year, unlawfully, willfully, and knowingly induced and procured the said employee to work for the week ending the 18th more than forty-eight hours, and that such employment and work of the said employee "did then and there affect interstate commerce," which the defendant then and there well knew, and which was in violation of the National Industrial Recovery Act, and of article 2 of section 3 of the Code of Fair Competition for the Petroleum Industry; that said Code was approved by the President of the United States on August 19, 1933, under and by virtue of an Act of Congress of June 16, 1933, known as the National Industrial Recovery Act; that the employment and work of the said employee did not come within any of the exemptions or exceptions of said act, or of said Code of Fair Competition, nor within any of the exemptions or exceptions of the supplements and modifications of said Fair Competition Code.

The second count charged that the same defendant, within the same venue, and during a week ending November 25th, operating a service station as a merchant and vendor, selling to the public the same products, and that the same employee, under the same inducement and procurement, worked at said service station for a period of more than forty-eight hours during the week ending November 25th; that the work of the said employee affected interstate commerce, and this count contained the same allegations mentioned above as having been contained in the first count.

The third count fixes the same venue and relates to the same week ending November 18th and to the same business and to the same employee, and charges that the defendant induced and procured the said employee to accept a weekly wage of less than $14.50, which "employment, work and wages of the said Charles R. Burkley did then and there affect interstate commerce," that the defendant knew this, and that such acts were in violation of the same act of Congress above mentioned and of the same code above mentioned, and also negatives the exceptions.

To the same effect is the fourth count, save and except that that count relates to the wages for the week ending November 25th.

The first two counts relate to hours of service and the last two counts to the wages alleged to have been paid.

The defendant filed an appropriate motion asking for a bill of particulars, "as to how and under what circumstances the defendant had then and there affected interstate commerce," as set out in the information. Responding to this application for more information, the following was furnished, to wit:

1. The acts of the defendants were in violation of paragraph (b) of section 3 of the Act of Congress of June 16, 1933 (15 USCA § 703 (b), known as the National Industrial Recovery Act, and also in violation of paragraph (f) of section 3 of said act (15 USCA § 703 (f), and also in violation of clause 3 of paragraph (a) of section 7 of said act (15 USCA § 707 (a) (3), reading as follows: "That employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the President."

These portions of the act were violated by the defendants' failure to comply with the maximum hours of labor and the minimum rates of pay prescribed by the President in the Code of Fair Competition for the Petroleum Industry, approved by the President August 19, 1933.

2. Defendants' acts in failing to comply

with the maximum hours of labor prescribed by the President as aforesaid affected interstate commerce, for the reason that causing employees to work longer hours than those prescribed necessarily prevents other unemployed men from regaining employment. The natural consequence of defendants' act in working men overtime is to cause competitors also to work their employees beyond the maximum hours prescribed by the President, thus still further increasing unemployment, and unemployment, by removing the purchasing power of the unemployed, is a direct burden upon interstate commerce, as is set forth in the preamble of the National Industrial Recovery Act. (Section 1 [15 USCA § 701].) The natural consequences of defendant's acts in paying less than the prescribed wages is to cause defendants' competitors to reduce wages to the level set by defendants, thereby reducing the purchasing power of wage-earners and thus affecting interstate commerce, as set forth in the preamble of the National Industrial Recovery Act.

3. That defendants, by working men longer hours than those prescribed by said Code and paying lower wages than those prescribed as aforesaid, are enabled to and have sold petroleum products at lower prices than would have been possible had they complied with the prescribed hours and wages. This compelled competitors, in order to avoid losing their business, to meet the lower prices, and, in order to sell at such lower prices, said competitors were compelled to reduce wages and increase hours, and to reduce the price which they were paying for petroleum products. Increasing hours and reducing wages affects interstate commerce, as set out herein in paragraph 2. Reducing the price of petroleum products at the refinery compels other refineries to likewise reduce prices, resulting in subnormal prices, which in turn compels the closing of refineries not able or not willing to meet such competition, thus taking the products of such closed refineries out of interstate commerce and thereby disrupting the normal flow of petroleum products in such interstate commerce.

The defendant attacks the information as thus particularized, in the respect indicated, and claims that there is no offense charged. He also moves to quash on the ground that there is no offense alleged, and specifically challenges the act of the Congress, and the code which followed, because the latter is a patent attempt by the executive department of the government to legislate. He also claims that both are in violation of the Fifth Amendment and of the Tenth Amendment and of the Ninth Amendment, and are in excess of the power granted to the Congress in section 8 of article 1 of the Constitution; also, that the entire proceeding is vague, indefinite, and uncertain, and that article 2 of section 3 of the Petroleum Code is wholly unauthorized.

The argument for both sides has resulted in a rearray of the lights that have been fixed from time to time by our highest court with reference to the boundaries of national constitutional power over interstate commerce, over individual contracts and as relating to emergencies.

The seriousness of the question cannot be denied. Oral argument shows that the defendant was conducting a little filling station in Dallas, selling gasoline to be burned in Texas, and made out of oil found and refined in Texas. There is no intimation that his business was other than intrastate, unless the information furnished in the bill of particulars places it within the interstate category.

■ It seems to me that the recent Minnesota moratorium decision by the Supreme Court has no direct bearing upon the National Recovery Act. Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413. Emergencies that may be involved or recognized by a state may be sustained under the general police power inherent in such states. But Congress has no general police power. It must bring its enactments within one of the specifications or implications granted by the national Constitution, otherwise there is a lack of constitutionality.

■ The national emergency doctrine goes no further than that an emergency may call into activity a power which already exists. It may not speak into life that which is dead or never was.

The meatful expressions relating to this particular matter, so far as the national power is concerned, are bordered by the Lever Act (40 Stat. 276), a war-time measure, for the conservation of coal; the District of Columbia Rent Act (41 Stat. 298), regulating the rent that the landlord could charge; the Northern Securities Case, 193 U. S. 197, 24 S. Ct. 436, 48 L. Ed. 679, and the Adamson Railway Wage Act (39 Stat. 721). Of course, we have the stockyards case (Cotting v. Godard, 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92) and the taxing of trading contracts.

An analysis of all of those cases precludes any thought save and except the exercise by the national government of a constitutional

power either for the waging of a war or for the protection of interstate commerce. Both of those powers are directly given in the Constitution.

It has been asserted in argument by distinguished counsel who appear for the prosecution that there is the emergency of unemployment, which has been declared to exist by the Congress, and which declaration of emergency is binding upon the judicial department of the government; that "employers must be required to put more money into business"; that "the normal flow of interstate commerce must be restored"; that, "unless there is an emergency any attempt to regulate any occurrence must be related to a direct effect upon interstate commerce, but that when an emergency does exist the effect which may be regulated may be an indirect one."

The rate cases which are known as the Shreveport (Houston, E. & W. T. R. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341) and the Wisconsin (Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086) cases, as well as Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, were unmistakably based, without any debate, where no difference of opinion may exist, upon interstate commerce. Railroads passing from state to state are engaged in that. Streams of live stock passing from the ranges to the markets are en route through many states.

But in the present situation that we are considering there is conceded to be an unemployment emergency. Now the national government has a right to do anything it can, and it is the business of that government to do anything it can to relieve that emergency, provided that which it does is within its power to do. Local business, business confined exclusively to a state, business which does not impinge upon or affect, or disturb interstate commerce, is wholly beyond the fingers of the national government. Such business is amenable to the local government. The fundamental laws of the land preserve and recognize both sorts. The very charter of the national government proclaimed the continuity of the power in the people and of the power in the states. The power that rests and remains with the citizen and with the state is as sovereign and unamenable to attacks from the national government as is the power of the national government sovereign and immune from any act of the state. Each must retain this separateness and this distinctness

and this independence in order to preserve the autonomy of the American system. The system is itself of infinite value. Experiments in the governmental field in other countries, as exhibited in history, drove the fathers to the thought, and keep us true to it, that a government such as is ours must have a dual system. That is a national and a state system. Our country is too large, sections are too remote, interests are too diversified, liberties are too numerous and valuable, and the activities of the people are too multiplied to permit a congestion of all power in the national seat.

As was very wisely said in James Everard's Breweries v. Day et al., 265 U. S. 545, 44 S. Ct. 628, 631, 68 L. Ed. 1174, of the "implied powers," that attach to express powers:

"The Constitution confers upon Congress the power to make all laws necessary and proper for carrying into execution all powers that are vested in it. Article 1, § 8, cl. 18. In the exercise of such non-enumerated or 'implied' powers it has long been settled that Congress is not limited to such measures as are indispensibly necessary to give effect to its express powers, but in the exercise of its discretion as to the means of carrying them into execution, may adopt any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished and consistent with the letter and spirit of the Constitution. * * *

"It is likewise well settled that where the means adopted by Congress are not prohibited and are calculated to effect the object intrusted to it, this Court may not inquire into the degree of their necessity; as this would be to pass the line which circumscribes the judicial department and to tread upon legislative ground."

This expression of the limitless territory of implication, which may not be gainsaid, calls for thoughtful circumspection in discovering the exact power that is given in the Constitution. And also in the search for such acts as really relate to those powers or things over which the Congress has expressed an implied jurisdiction.

It has been thoughtfully suggested that the newspaper which we read in the morning is the physical product of far-away jurisdictions; that the food which is eaten on the table of the citizen comes from many climes; that the clothes that give the body its respectability and health, and which preserve it from the rigors of the climate and elements, is not always local in conception. To grant

the proposition that one who sells an apple in a stand on a street in the city of Dallas for a less amount than the price fixed by a code which relates to sale of fruit, because that apple may have been raised in Oregon or in New Mexico, or because the hand that delivers it to the purchaser and receives a nickel therefor is the hand of an humble employee who gets less than a nationally fixed wage, is thereby liable to arrest and prosecution for a violation of a Federal Code under this act, it seems to me, would be stretching the power of the national government beyond apology. What may be said, then, of a criminal law which punishes a Texan for selling that which came out of Texas earth, has never been elsewhere, and is being consumed in Texas? The voice of the nation's highest court, speaking through such cases as Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963; Standard Oil Co. v. U. S., 283 U. S. 163, 51 S. Ct. 421, 75 L. Ed. 926; U. S. v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; U. S. v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045; Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238; Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163; Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327; Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596; New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 76 L. Ed. 747; Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190, 77 L. Ed. 375; Michigan Comn. v. Duke, 266 U. S. 570, 45 S. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; Frost Trucking Co. v. R. R. Comn., 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264, even now cautions and points the way.

The mental giant in the fineness of logic may trace a connection between a puff of the breath as an augmenter of the passing wind, or between the light of the burning coal and the primal rays of the sun, but that sort of a fineness in scientific reasoning may not be carried into the practical execution of the criminal law for the purpose of showing a connection between some one who sells an apple or a suit of clothes or a newspaper or a gallon of gasoline so as to therefrom argue a direct effect upon interstate commerce. See H. Chassaniol v. City of Greenwood, 291 U. S. ——, 54 S. Ct. 541, 78 L. Ed. ——, which upholds a state tax on a buyer of cotton destined to out of state points.

The national government may preserve itself from destruction. That same right exists in the citizen to preserve himself from destruction. The right of national self-defense is no greater than the right of individual self-defense. But the right of the government to preserve itself from all sorts of attacks, either within or without, must not masquerade in times of peace in some other costume. The power of the national government to carry on the many activities for the relief of the unemployed that are now being carried on in the distribution of moneys and possessions and properties is not in question here. Nor could it be questioned here successfully.

The only controversy that is here is between the humble citizen who asserts his right to carry on his little business in a purely local commodity and in a purely local fashion, without being arrested and punished for a mythical, indirect effect upon interstate commerce. If this were a suit at equity such as have been presented in different jurisdictions, there might be more liberality for the position of the sovereignty. But the fundamentals of individual liberty are safeguarded by certain presumptions, by certain reasonable doubts, by certain requisites as to certainty of allegation and certainty of proof that even a national court, upon the request of the national government, cannot, with ease, ignore or destroy.

█ My opinion is, without multiplying thoughts and reasons, that the regulations and the law sought to be applied under this information and bill of particulars are wholly without authority, and are in violation of the well recognized and established guaranties of the citizen.