## UNITED STATES v. SPOTLESS DOLLAR CLEANERS, Inc.

District Court, S. D. New York.
March 31, 1934.

Martin Conboy, U. S. Atty., of New York City (Francis H. Horan, of Washington, D. C., and John F. Davidson, Edward J. Ennis, and Irvin C. Rutter, all of New York City, of counsel), for the United States.

S. Frederick Placer, of New York City (Martin W. Littleton and Isadore Paul, both of New York City, of counsel), for defendant.

KNOX, District Judge.

The court is here asked to restrain defendant, pendente lite, from performing certain retail dry-cleaning and dyeing services within New York Trade Area No. 12, which includes this city, at prices that are below certain minimums established for such services under article VI, section 3 (h), of the Code of Fair Competition for the Cleaning and Dyeing Trade, approved by the President on November 8, 1933.

Jurisdiction is invoked under the provisions of title 1, of the National Industrial Recovery Act (Public No. 67, 73d Congress [15 USCA § 701 et seq.]), approved June 16, 1933, and particularly under section 3 (c) of the act (15 USCA § 703 (c). This latter section reads: "(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

Defendant, a New York corporation, is engaged in operating thirty-two stores within the city of New York, at which the service of dry-cleaning and processing incidental thereto are offered for sale to the public. Fabrics and clothing which defendant receives from customers patronizing its stores are delivered for cleansing to Empire Cleaners & Dyers, Inc., a New Jersey corporation, which maintains a wholesale processing plant at Edgewater, N. J., upon the westerly side of the Hudson river. The complaint declares that this corporation and the defendant are "owned and controlled by substantially the same persons either through common stock ownership or through ownership of a controlling interest in the stock of one corporation by the other corporation, and are managed and conducted by substantially the same executive officers as a single business enterprise."

Under the code the minimum retail price for dry-cleaning a suit of men's clothing is 70 cents. For a similar service to a woman's dress, the minimum code price is 75 cents. Defendant performs like services upon such garments for charges of 39 and 45 cents, respectively, and threatens to continue so to do.

The government avers that, due to the relationship existing between defendant and

Empire Cleaners & Dyers, Inc., the method of retailing the dry-cleaning services in controversy constitutes interstate commerce. In reality, it is said defendant's business must be viewed as made up of the sales of services performed in New Jersey to persons in New York, who purchase the same. This alleged feature of the case is stressed by statements that all garments are transported to and from the retail stores in New York and the cleaning plant located in New Jersey, and that money, credits, etc., from customers in New York are ultimately transferred to the corporation in New Jersey. The complainant further contends that defendant's low prices for the services sold affect interstate commerce, in that substantial portions of dry-cleaning services of which residents of New York avail themselves are purchased from members of the cleaning and dyeing trade who operate from locations situated in states adjoining New York, and who are therefore in active competition with defendant. Therefore retail prices charged by defendant have an immediate and necessary effect towards reducing both retail and wholesale prices of competitors. This leads to (1) an obstruction to the free flow of interstate commerce and a consequent diminution thereof; (2) a decrease in the ability and requirement of members of the trade to purchase machinery, naphtha, chemicals, and other supplies required to carry on business; (3) a decrease in employment among workers in the industry, and an impairment in their standards of labor, accompanied by a decline in the power of the workers to purchase and consume industrial and agricultural products, customarily moving in interstate commerce; and (4) a frustration of the purposes and policy of the National Industrial Recovery Act.

Complainant's bill then proceeds to call attention to the existing emergency in commercial and industrial life, and says that it has affected the cleaning and dyeing trade with particular adversity. Until the approval of the code, continues the pleading, the industry was in chaotic condition. There was widespread unemployment with excessively low wages paid to, and unduly long hours imposed upon, those who still held jobs. Failures of service merchants were numerous, and the trade generally reeked with trade wars and other vicious trade practices. These conditions, the allegations continue, are now improving, but, if defendant is to be permitted to continue to maintain its present low prices the improvement will be arrested, and such advantages as have been gained will be lost. A continuance of defendant's conduct will attract business from members of the trade who adhere to code prices and inevitably will result in destructive price wars, with all their attendant evils.

To prevent these potentialities, the court is asked to employ its injunctive process.

Defendant's answer to the complaint consists of a general denial, together with the following specific defenses:

"First: That defendant is engaged wholly and solely in intrastate commerce as adjudicated by the Supreme Court of the State in an action entitled, 'Cleaners' & Dyers' Board of Trade, Inc., and Joseph Goldstein, etc., Plaintiff, against Spotless Dollar Cleaners, Inc., Defendant,' (the defendant here) [150 Misc. 699, 270 N. Y. S. 153] and also by a judgment of the Court of Special Sessions of the City of New York, County of New York in a proceeding entitled, 'People of the State of New York against Spotless Dollar Cleaners, Inc., defendant' (also defendant here).

"Second: That defendant employs 250 employees in its stores, and has invested large sums of money in such establishments and has built up a good will of great value; that it has many competitors similarly situated; that the trade is divided into two branches, rendering two distinct types of service,—one a 'cash and carry,' the other,— a 'call and delivery' service. Defendant engages in the former. Thirty percent of the entire retail cleaning and dyeing trade in the United States is of the 'cash and carry' variety, and that, as between the two types of service, the Code fails to make a proper price differential and that, if defendant be compelled to comply with the minimum prices of the code, which are said to be arbitrary, unjust and discriminatory, it will be financially ruined, and thus be deprived of fundamental constitutional rights.

"Third: That defendant secures a fair return and profit upon its investment at the prices it charges for dry-cleaning services, and that it pays its employees wages which are at least equal to, and more than the minimums specified by the code, and that such employees have worked no more than the maximum number of hours therein prescribed.

"Fourth: That defendant is engaged in a strictly private business which is not vested with any public interest. Neither does it endanger the public health, welfare and morals of the people, either of the community in which it does business, or of the United States. It denies any right in the National

Code Authority to fix prices at which its services shall be sold. In this connection the constitutionality of the National Industrial Recovery Act is bluntly challenged."

That the cleaning and dyeing business is an important "service industry" which makes a worthwhile contribution to the sum total of the nation's commercial activities is clear. In dollar volume, the business rose from $53,000,000 in 1919 to $201,000,000 in 1929. Over the same period, the wages of workers within the industry increased from seventeen and one-half millions of dollars to almost seventy-six millions. In 1932, when the pall of depression had settled leadenly over all the land, these wages declined to forty millions, a sum still far from negligible. Within metropolitan communities, the dry-cleaning agency in closest touch with customers is the retail store and small tailor shop. When clothing and fabrics are carried to, or collected by, a representative of the store or shop, the greater quantity thereof is sent to a wholesale cleansing plant in which the retail dealer, generally speaking, has no proprietary interest. Seventy per cent. of the trade in this city is so handled. The remainder passes through establishments which have an interest, more or less clearly defined, in the wholesale processing plant. Defendant's organization falls within the latter category.

Complainant's affidavits declare that over the past few years competitive conditions in the industry have been severe. In 1930, price wars broke out in various sections of the country. At or about this time the standard prices obtained in Chicago for cleaning men's suits and women's dresses were $1.75 and $2, respectively. A cleaner in Springfield, Ill., where wage scales were lower and where union labor did not hold sway, started a parcel post cleaning service at half prices. Numerous small city dealers followed his example. A cut price shop was opened in Chicago, and the rates of established dealers were forced to $1 per garment. A labor lockout followed, and was succeeded by a reduction in the wages of employees. Cut rate stores in Chicago successfully insisted that small cleaning plants in Illinois, Missouri, Indiana, and Wisconsin, to which they sent garments, should by reduced charges absorb a portion of the cut prices, and thus enable cleaning service to be sold at 49 cents per garment. Business disaster came to many dealers, and the return to workers in the industry where unemployment had not been the result fell to sums that necessitated low standards of living. With variable conditions, similar situations developed in North Carolina, Kentucky, Pennsylvania, Texas, and elsewhere. The nature of the cleaning business is claimed to be such that the conditions which develop in one section of the country, particularly in the larger centers of population, are quickly reflected in nearby cities of other states. The next contention by complainant is that, so long as prices are left to the free play of competition, the following results in the industry may confidently be expected: (1) Wage cuts and long hours of labor for employees; (2) an inferior quality of service; (3) financial distress to owners of processing plants with consequent decrease in their purchases of machinery and supplies; (4) the practical destruction of credit to persons engaged in the business; (5) a decline in the purchasing power of employees of the industry amounting to $50,000,000 per annum.

So baneful, says the government, has been the sum total of conditions affecting the cleaning and dyeing business, that it has been brought to the brink of ruin, and has subjected the more hardy establishments within the industry to the terrorism of the racketeer and trade ruffian. The situation thus created in particular localities has been aggravated by existing facilities of commerce and communication between the states, especially where large cities are to be found near state boundary lines. When such is the case, the problems and difficulties prevailing in the industry in one large city spread as does a miasmic mist over the territory of the adjacent state and its nearby city. Hence a price war which breaks out in one locality soon rages fiercely elsewhere.

The industry is further represented as being possessed of peculiar frailties. One reason assigned for this is that profits in the industry are dependent primarily upon a "volume" business, and that "volume" flows to the merchants who unfairly cut prices to the point of profit banishment. In this way, merchants who are either unwilling or unable to meet the nonprofit prices of competition are forced to retire from the field in which they once prospered. When fatalities of this nature have become sufficiently great, the man who has wrought disaster to his vanquished opponents views his accomplishment with satisfaction, and makes haste to raise his prices. Meanwhile, the price of labor in the industry has been forced from living standards to those of bare existence; bankruptcies have occurred; the quality of service rendered the public has been impaired; and, finally, unemployed workers of the industry walk the streets. In addition, other results have come

about. Among them is a falling off in commercial transactions between states wherein the manufacture of cleaning machinery, chemicals, and other supplies take place and the states in which they are utilized in the processing of garments.

The affidavits filed by the government reveal numerous instances throughout the country where each of the aforementioned impediments to the free and prosperous flow of business are claimed to have served to lower standards of living and to have dwarfed business activity.

One avowed design of the code adopted for the industry is to remedy the aforesaid conditions, and the maintenance of minimum prices specified therein, it is thought, will be highly conducive to that end.

Defendant, on the other hand, is in accord with but few of the foregoing statements and theories of the government, and it declines to conform to the minimum prices specified by the code.

According to its version of the facts, a determined effort is here under way to make it the slaughtered victim of a strongly organized trade association, composed of some 6,000 "call and delivery" cleaners, and representing 70 per cent. of the industry, and which has unfairly influenced the code authority with respect to prices that should be charged for cleaning services. These organized merchants, it is charged, are here seeking opportunity through the elimination of defendant to reap the business which defendant has built up through reasonable prices, and which, prior to the advent of cash and carry stores, were nonexistent. In other words, the claim is that the development of the cleaning business from the status of a luxury industry into one of wide popularity is due principally to the fact that defendant, together with other dealers of like class, has placed the facilities of the business within the pocketbook capacity of a large portion of the population.

Attention is also directed to the circumstance that the great bulk of the affidavits submitted by the government has been gathered from distant parts of the country, and that they relate to conditions that are not to be found, and which have not existed, in this locality. As bearing upon this contention, it is said that complainant's affiants, carefully and purposely selected, are operators whose plants are located near state border lines, and which, naturally enough, draw business from adjoining states. For

this reason, the statements made by the affiants, even if truthful, do not represent conditions that are typical of the industry. Defendant points out, in this connection, that it offers no dry-cleaning services to the public residing in New Jersey, but confines its retail business to such persons in the city of New York as wish to take advantage of the same.

Instead of accepting blame for any racketeering and ruffianism that has afflicted the industry, defendant vigorously claims credit for the fearlessness it has displayed in resisting demands of the racketeers. Beyond this, it is asserted that the excessive minimum prices fixed by code invite departures therefrom by "call and delivery" cleaners as well as by "cash and carry" merchants, and cannot help but affect the industry with more tribulation. In great detail the court is supplied with figures and comparisons intended to show that a substantial price differential should exist between the type of service furnished by defendant and that supplied by the "call and delivery" cleaners. Stress is laid upon the inability of defendant without such differential to compete with established institutions which have, for generations, furnished a quality service to patrons of long standing, and which, along therewith, call and deliver goods and extend credit.

As bearing upon the argument that defendant's method of doing business and the prices it charges have served to diminish interstate commerce in materials, machinery, and other cleaning supplies, the court is told that more garments are presently subjected to dry-cleaning than were so processed at the very peak of industrial activity.

Proceeding then to the matter of financial disasters that have marked the industry, as asserted by complainant, the defendant declares that, proportionately, bankruptcies have been no more frequent and have involved no greater liabilities than those which characterized other industries of like size and importance.

All of these things, and many more, lend some, but not complete refutation to the conclusions which the government asks me to adopt. As between some of the conflicting economic and social theories advanced, it is unnecessary to make a choice.

But, even so, the decision to be made necessitates a brief consideration of the background against which the National Recovery Act was enacted, and of the boundaries within which the code authority may, if at all,

fix minimum prices for services to be rendered by persons engaged in the cleaning and dyeing industry.

At the outset, it may be said that no sane man can deny that a national economic emergency of great severity was in existence at the time of the enactment of the statute. It had spread over the land, and had so devastated industry that highly drastic efforts by Congress, in order to overcome its influence, were mandatory. And, in the presence of impending disaster, it is not to be wondered that the national Legislature had resort to unusual means in order (1) to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; (2) to provide for the general welfare by promoting the organization of industry for the purpose of co-operative action among trade groups; (3) to induce and maintain united action of labor and management under adequate governmental sanction and supervision; (4) to eliminate unfair competitive practices; (5) to. promote the fullest possible utilization of the present productive capacity of industries; (6) to avoid undue restriction of production (except as may be temporarily required); (7) to increase the consumption of industrial and agricultural products by increasing purchasing power; (8) to reduce and relieve unemployment; (9) to improve standards of labor; (10) to rehabilitate industry; (11) to conserve natural resources. See "The National Industrial Recovery Act," by Milton Handler, American Bar Association Journal of August, 1933.

To the end that these purposes might be accomplished, the President was vested with broad and comprehensive powers. With the right of Congress to make such delegation, there can be, in my opinion, no reasonable dispute. Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; J. W. Hampton, Jr., v. U. S., 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; New York Central Securities Corporation v. U. S., 287 U. S. 12, 53 S. Ct. 45, 77 L. Ed. 138.

The power so delegated has been liberally exercised, and with ameliorating effect, but the danger of further ravage by our economic depression is still present. If noncompliance with industrial codes contemplated by the act tends to perpetuate the dangers and to frustrate the objects of Congress, then this court, within the limitations of the statute, may rightfully interfere to compel compliance. And, in doing so, there should be no hesitancy.

In approaching a consideration of the nature of the transactions of the defendant and their relationship to interstate commerce, it should be understood that I hold the code authority for the dyeing and cleaning trade to have been warranted in failing to establish a price differential between so-called "cash and carry" cleaning services, and those of a "call and deliver" service. The evidence taken at the hearings, held pursuant to the terms of the code, sustained the finding that the cost of one service is the substantial equivalent of the other. Further, the proof here shows that defendant does not confine itself to "cash and carry" operations, exclusively. In some instances and for no additional charge, it delivers garments of customers to their homes. On other occasions, it exacts a price of 10 cents, in addition to cleaning charges, for picking up and delivering the goods of its patrons.

In my justification of the absence of a price differential, I place myself in opposition to the ruling of Judge McGeehan of the Supreme Court of the state of New York, in the case of Cleaners' & Dyers' Board of Trade, Inc., v. Spotless Dollar Cleaners, Inc., 150 Misc. 699, 270 N. Y. S. 153, to which I shall hereafter advert in greater detail. This difference of opinion is voiced with deference and respect to a very able judge.

Now, whatever may be the degree of firmness of all the materials that entered the foundation of the National Industrial Recovery Act (48 Stat. 195), and irrespective of whether the foundations will support all trade regulatory structures that may be erected thereon, it has a completely solid cornerstone in the power of Congress to regulate interstate and foreign commerce. Congress, it would seem, relied upon that power alone when it authorized the federal District Courts to lend assistance in enforcing compliance with codes. A reference to section 3 of the statute (15 USCA § 703), wherein provision is made for resort to the powers and processes of the federal District Courts for aid in enforcing the law, makes this reasonably clear. Subdivision (b) and (f) of the section (15 USCA § 703 (b, f) intensify the view. In part, they read as follows:

"(b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade. * * * Any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition in commerce within the meaning of the Federal Trade Commission Act as amended [chapter 2 of this title]. * * *

"(f) When a code of fair competition has been approved or prescribed by the President * * * any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor. * . * * "

Such, too, is the theory of the present complaint. Its elaborate allegations relative to the interstate character of defendant's business must be recognized as the deliberate thought of the government that only the involvement of interstate or foreign commerce in the challenged price cutting can presently give jurisdiction to this court. Upon this predication also the proof has been adduced, and complainant's argument made.

■ Therefore the chief line of inquiry is as to whether defendant's business is possessed of an intrastate or interstate character. If defendant engages in interstate commerce directly, or if its intrastate business adversely affects the free flow of the interstate trade of others, its acts are subject to the restraint here sought. See Houston, E. & W. T. Ry. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; American Express Co. v. State of South Dakota ex rel. Caldwell, 244 U. S. 617, 37 S. Ct. 656, 61 L. Ed. 1352; and United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Nebbia v. People of State of N. Y. (March 5, 1934) 54 S. Ct. 505, 78 L. Ed. ——, 89 A. L. R. 1469.

■ In the light of the law as these cases reveal it, I think the government is entitled to a decree.

At the same time, two adjudications are cited by defendant as lending themselves to a contrary result. These are the two cases in which acts of defendant, in most respects similar to those here disclosed, have engaged the attention of the state courts of the state of New York.

Upon the first occasion, the defendant was criminally prosecuted under the Schackno Act (Laws 1933, c. 745), which incorporated the code into the law of this state, in the Court of Special Sessions of the City of New York. The offense alleged was that it had charged prices below the code minimums. After hearing, defendant was adjudged guilty of the offense and was fined.

In order to exercise jurisdiction, defendant argues, the court necessarily must have found that defendant was engaged in intrastate commerce. Thereafter the Cleaning and Dyeing Board of Trade, Inc., which is said to have instigated the foregoing prosecution, and which is charged, also, to have been responsible, in part, for the present action, became a party plaintiff in a suit that was brought in the Supreme Court, New York county, to enjoin defendant from continuing to charge the prices in controversy. Relief was denied. Judge McGeehan, before whom the litigation was had, ruled that the Supreme Court of the state was vested with jurisdiction in the premises, and that the statute was not prima facie unconstitutional. He held, however, that a "call and deliver credit" service is quite different from one of the "cash and carry" variety. In this connection, he said:

"After a detailed investigation, the officials of the N. I. R. A. (National Industrial Recovery Act) were impressed with the argument that a service of calling for goods, delivering them, granting credit, and collecting these petty bills does not cost anything. I decline to be so credulous. Stripped of its camouflage, the effort of plaintiffs is to drive defendants out of business, for the facts and argument of plaintiffs conclusively prove that patrons will not accept the meager service of defendants if they can get the much better service offered by plaintiffs at the same price. These services are distinctly different. I deliberately overrule the finding that they are the same. * * * If this law means that N. I. R. A. has the power to compel a man whose service is worth 40 cents to charge 75 cents for it, so that his customers will leave him and deal with his competitor whose service is worth 75 cents, then it is unconstitutional. It is not unconstitutional because that is not what it means. If it gives to this court the right to review without power to reverse, it is unconstitutional. It is not unconstitutional because as a part of the review it gives this court the right to reverse on the facts and the law. * * * I decline to enjoin these defendants. I also refuse to fix a rate for the cash and carry service. That duty belongs with the N. I. R. A. When they fix a proper rate, I shall enforce it if the motion comes before me."

If it should be, as argued, that the decisions of the state court may be construed as adjudications that defendant is not engaged in interstate commerce, the proof before me should, perhaps, receive further elaboration, and it will now be attempted.

When the suit in the Supreme Court of the state, and which has been mentioned, was in progress, Louis Dernberg, vice president of defendant corporation, made an affidavit therein upon behalf of his company. It contained this averment:

" * * * That the defendant corporation is * * * organized under the laws of the

State of New York, and is engaged in the conduct of a retail dry cleaning business, through its wholly owned outlets of which there are thirty-two in number.

"All of these outlets are operated in the City of New York. The Spotless Dollar Cleaners, Inc. also operates a plant where all the dry-cleaning work is done, in the town of Edgewater, New Jersey."

In addition, the chairman of the local administrative board for the code authority within this area deposes, upon investigation which he conducted, that both the defendant and the New Jersey concern are owned and operated by identical interests. The garments are conveyed from New York to New Jersey and back by truck displaying defendant's name painted on the side panels and bearing a New Jersey license.

Nowhere, save in the answer to the complaint, wherein an allegation of identity of such operation of and control is made, is a categorical denial of these assertions to be found. Argumentatively, defendant's affidavits would have me infer that there is diversity between the two corporations, but they are far from convincing.

In touching upon this matter, I may again refer to the Supreme Court action and mention the following circumstances. In the memorandum there filed by counsel for the defendant, he stated: "The defendant is engaged in an interstate business and the conduct of such interstate business can be regulated only by the National Government, and cannot be influenced or regulated by any State enactment."

While an expression of counsel's belief upon another occasion, of conclusions properly to be drawn from other proof, should not bind his client upon a question of fact which here may differently be presented, it may not be amiss, upon the whole, to give the statement a modicum of weight in making analysis of the arguments here made that defendant's business is limited to intrastate transactions.

Superficially the business in which defendant engages with a customer is locally initiated and concluded. Customers are unaware that their clothing is processed within the state of New Jersey, and, so far as they are advised, they are in contact only with defendant. Nevertheless, the actuality is that Empire Cleaners & Dyers, Inc., in order that defendant may fulfill its cleaning service contracts with patrons of its New York stores, must process each and every garment that is delivered to the stores. For this to be ac-complished, each garment must make two separate and distinct interstate movements. If it be, as apparently is true, that defendant and Empire Cleaners & Dyers, notwithstanding their different corporate names, are under a common management, ownership, and control, the sale of cleaning services is as much interstate as intrastate commerce. It therefore falls within the authority of Kansas City v. Seaman, 99 Kan. 143, 160 P. 1139, L. R. A. 1917B, 341. The facts there were that a steam laundry, located in Missouri, sent an employee in a wagon into the state of Kansas to gather the linen of patrons residing in the latter state. He then took it to the plant in Missouri, where it was washed and ironed. It was then returned by wagon to the customer in Kansas, the driver collecting the charges. The driver having been arrested and convicted for violating an ordinance of Kansas City, Kan., which imposed a license tax upon each laundry there doing business, the Supreme Court set aside the conviction. In so doing it assigned two grounds for its action, first, that the wagon driver was not conducting a laundry in Kansas City, as was contemplated by the ordinance; and, second, that the collection of the goods in Kansas, carrying them into Missouri, and returning them to their owners, constituted interstate commerce. Commonwealth v. Pearl Laundry Co., 105 Ky. 259, 49 S. W. 26, is to the same effect. See, also, Simpson-Crawford Co. v. Borough of Atlantic Highlands (C. C. N. J. 1908) 158 F. 372.

If it be that my finding of the existence of an identity in the operation, management, and control of defendant and Empire Dyers & Cleaners, Inc., be correct, there is no difficulty in treating the persons in charge of defendant's retail stores as agents also of the New Jersey organization. In reality, their sales of cleaning services are transactions of Empire Cleaners & Dyers, Inc., quite as much as they are those of defendant.

In order to relieve itself of liability in this suit, defendant places strong reliance upon the case of Smith v. Jackson, 103 Tenn. 673, 54 S. W. 981, 47 L. R. A. 416. There the Supreme Court of Tennessee held that a tax on agents of laundries located in other states, but who did business in Tennessee, was valid for the reason that gathering and shipping laundry back and forth across state lines did not constitute commerce.

The court founded its decision, in my judgment erroneously, upon the ruling contained in Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357, which had to do with an insurance contract. I cannot but believe that serv-

ice contracts made by defendant with relation to physical subject-matter which necessarily must move regularly, usually, and in large volume across the boundary line of adjoining states, is commerce, both in theory and in fact. Certainly it is intercourse, and traffic is one of its outstanding ingredients. Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678. In spite of all this it might, under some circumstances, be argued that minimum prices upon transactions in interstate commerce may not be utilized for the equalization of economic conditions. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724. In this behalf, the following considerations might be urged: There are upwards of 20,-000 tailor shops and dry-cleaning outlets in the city of New York. In large measure, they are of humble status and serve limited neighborhoods. Their proprietors are content with a small trade, and their customers are satisfied with the services received. Many of these proprietors do their own work and in their individualistic ways. Their costs are as variable as the buildings they occupy. The transactions taking place in these shops are purely intrastate. If they affect interstate commerce in any way, they do it so remotely and indirectly as to be of little consequence. See United States v. Suburban Motor Service Corporation et al. (U. S. D. C. N. D. of Illinois, Eastern Division, 1934) 5 F. Supp. 798, Prentice Hall Federal Trade and Industry Service No. 8032. But, after all of the businesses so conducted are taken into account, there remains a substantial number of dry-cleaning establishments which operate in an entirely different manner, and which were accustomed to make frequent and constant use of the facilities of interstate commerce. In servicing their customers, they followed the procedure of defendants, and sent their goods to wholesale cleaning plants, some fifteen in number, located on the westerly side of the Hudson river in New Jersey.

Since the time that defendant refused to adhere to the minimum code prices, the business formerly conducted by these plants with retail outlets in New York City has ceased. While the total number of local outlets formerly served is not shown by the papers, it does appear that the plant of Nu-Life Cleaners & Dyers, Inc., situated at Leonia, N. J., and not far removed from Edgewater, has lost the trade of twenty-five retail stores located within the city of Yonkers, N. Y. The processing plant of Fort Lee (N. J.), French Cleaners & Dyers, Inc., has likewise been affected adversely. Some of its retail customers now bring their work to New York where it may more cheaply be done.

For the purpose of my decision, I shall disregard the strike of workers in the industry which is said to be attributable to the price cutting of defendant. Aside from this, enough has been shown to enable me to conclude that such price cutting as has occurred has seriously impeded and changed the customary and usual flow of interstate commerce in the dry-cleaning industry between the states of New York and New Jersey. If defendant be permitted to continue its unfair prices, further changes in such currents and flow are inevitable, and these will contribute to the frustration of the purposes of the National Industrial Recovery Act. In this industry, profits are dependent largely upon volume business. With due allowance for equivalency in quality of work and general type of service, the volume of the business depends upon price and it will go to the establishment where prices are the lowest. Such has been the result of price cutting in other parts of the country, and there is no reason to suppose that there will be a difference here. In order to overcome tendencies which divert and stem movements in interstate commerce, Congress may act as it has, and is competent to authorize this court to take such steps as will allow interstate trade to be conducted in smoother channels and in accordance with the execution of policies that are believed to be wise and expedient. It is not enough for defendant, in opposition to the will of Congress, to say that the policy of minimum price fixing for industrial service is not a means of which the government may properly take advantage. I agree with the proposition announced by the Supreme Court, and here called to defendant's aid, that an emergency is incapable of conferring power, previously nonexistent, upon its victim. At the same time, it must be said that the victim, in an effort to extricate himself from his predicament, and to survive, can use his latent strength to the full. The struggle that is put forth may be ill-timed and awkward; it may not conform to precedent; and it may eventuate in utter futility, so far as the object to be achieved is concerned, but the strategy of a battle within the limits of strength belongs to the authority in command. And who can rightly say, with assurance, that governmental price fixing, when confined to transactions in interstate commerce, is not a means reasonably adapted to the legitimate ends which Congress seeks to serve? As I view the

law, the court cannot certainly say that it is not, and the government may have a decree.

In rendering this decision, I know full well that it may be a distinct step beyond the boundaries which, in peace times, have been said to circumscribe the powers of the Congress. If defendant be immediately restrained from continuing its violation of the minimum prices of the code, and my conclusion should hereafter be held to be erroneous, great damage will be its portion. Therefore I will suspend operation of the injunction for ten days. Within that period, defendant can apply to the Circuit Court of Appeals for a further stay.