**SPIELMAN MOTOR SALES CO., Inc., v. DODGE, Dist. Atty.**

District Court, S. D. New York.
Oct. 5, 1934.

438

John J. Bennett, Jr., Atty. Gen. (Henry Epstein, Sol. Gen., of New York City, of counsel), for the Attorney General.

Miller, Paul & Placer, of New York City (S. Frederick Placer and Isadore Paul, both of New York City, of counsel), for complainant.

David Blitzer, Asst. Dist. Atty., and Harold H. Straus, Sp. Asst. to Dist. Atty., both of New York City (Stanley Osserman, of New York City, of counsel), for defendant.

Eugene Frederick Roth, Asst. Counsel, Litigation Division, National Recovery Administration, of New York City, amicus curiæ.

Before MANTON, Circuit Judge, and PATTERSON and HULBERT, District Judges.

MANTON, Circuit Judge.

This suit, heard before a court convened pursuant to title 28, § 380, United States Code (28 USCA § 380), seeks to enjoin the enforcement of chapter 781 of the Laws of 1933 of New York (Ex. Sess.), because, it is said, the statute violates the Federal Constitution (Fourteenth Amendment) and the New York state Constitution (article 3, § 17). The act is said to violate the latter because it constitutes an invalid delegation of legislative authority. The challenged act, passed in aid of the National Industrial Recovery Act (48 Stat. 195), has for its purpose the regulation by codes, duly adopted, of all industries which are subject to code regulation.

Pursuant to the National Industrial Recovery Act, approved June 16, 1933, a code of fair competition for the motor vehicle retailing trade was formulated and accepted by the President of the United States on October 3, 1933. By article 4, subd. (a), of the Code, a method of ascertaining the maximum allowance that may be made in the sale of a new car was fixed. This maximum is arrived at by averaging the actual sales prices of used cars of each make and model of car over a specified period in a particular trade area as reported by the members of the trade in sworn statements to the National Automobile Dealers' Association. In arriving at this average, the lowest 20 per cent. of all sales are eliminated, and from this average a deduction of from 5 to 15 per cent. must be made to com-

pute the maximum allowance for trade-ins. The amount to be so deducted depends upon the maturity of the model. The code also prohibits selling below, or giving a discount on, the factory list price of a new car plus certain expenses.

The plaintiff is an automobile dealer merchandising Chevrolet cars within the state in very substantial numbers annually. Plaintiff's principal objection to the automobile code adopted is directed to the trade-in transactions when a new motorcar is purchased. It is claimed that any trade-in allowances against sale prices, rebates, and other devices are used to defeat fixed price schedules for the secondhand car.

The purpose of the code is to regulate the amount to be allowed on used cars which are accepted by dealers in a trade-in transaction. Unregulated allowances were an evil which led to unfair competition. Under the state act (Schackno Law), provision is made for enforcement, by the state of New York, of the codes adopted under the National Industrial Recovery Act, upon the filing of such codes with the secretary of the state of New York (Laws 1933 [Ex. Sess.] c. 781, § 2). Thus the codes become the standard of competition in intrastate business. The automobile code was so filed with the secretary of state. Under the code, prices of used cars are attempted to be fixed for trade-ins only. Otherwise the field as to used car prices and factory list prices of new cars is open and remains changeable at the will of the purchaser. The fixing or attempted fixing of prices for trade-ins is an attempt to cure an evil leading to unfair competition and, as such, is price regulation. That there may be a difference between the reasonable value of a used car in the open market and the maximum allowance permitted, under the code, on a trade-in, would not necessarily mean a discrimination, unless it be that the allowance so fixed is arbitrary, unreasonable, or capricious.

Price regulation by the code, filed pursuant to the act, does not violate the Constitution. Nebbia v. People, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. There is no deprivation of equal protection of the law. The code does not place plaintiff at a disadvantage or affect him adversely, and this alone is fatal to the claim of denial of equal protection. Nor is plaintiff denied due process by the statute's enforcement. There is an admitted power in the Legislature to regulate existing economic evils by an appropriate regulation of business. Home Bldg. & Loan Asso. v. Blaisdell, 290 U. S. 398,

54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. The indirect result may be a restriction of freedom of contract.

Fixation of prices for trade-ins is based upon the fact, sufficient to satisfy the Legislature, that the retail automobile industry has been adversely affected by economic conditions sufficiently to create an emergency. In Nebbia v. People, supra, the court said on page 535 of 291 U. S., 54 S. Ct. 505, 515, after referring to Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, that "many other decisions show that the private character of a business does not necessarily remove it from the realm of regulation of charges or prices."

And further:

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 535, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280. * * * These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. * * *

"If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public."

■ The code method of ascertaining the maximum used-car allowance is reasonable. To be sure, all practical price regulation may have as a consequence some individual inequalities. But a price based on an average of business or of trades in the past is harmonious and seems to be founded in fairness.

An average arrived at from the amounts, some of which are in excess of and some below the means, does not work for invalidity as long as the basic principle or method is fair. The principle of regulation of price is fundamentally fair, even though there is some reasonable disregard in individual cases. Such disregard is inherent in any broad social policy.

■ There are no facts found in the complaint and moving papers supporting the plaintiff's claim of an unfair difference between the maximum used-car allowance permitted by the code and the reasonable value of a car submitted for trade-in purposes. To support the plaintiff's case, it must be shown that the method of fixing the trade-in allowance is arbitrary or discriminatory, leading, by caprice or otherwise, to unreasonable discrepancies. No more reasonable method of regulation for the correction of an evil of unfair trade is pointed out. Without a convincing showing by specific instances of unreasonable differences between the maximum permitted under the code and the real market values, no general charge of unconstitutionality can be sustained. Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 35 S. Ct. 167, 59 L. Ed. 364; Plymouth Coal Co. v. Pa., 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713.

■ Complaint is also made of the code provisions (article 4, § b, par. 2) giving regulations as to discounts and allowances by dealers. Maintenance of prices by manufacturers through contractual arrangements with dealers or agents have long existed. It is not price fixing; the ultimate price still remains in the will of the manufacturer's discretion. Such maintenance of prices by agents and dealers flows from the contractual relationships with other manufacturers, and is permissible as well as legal. Appalachian Coals, Inc., v. United States, 288 U. S. 344, 53 S. Ct. 471, 77 L. Ed. 825. Nothing alleged in the complaint points to an instance where the plaintiff sought to give a discount or rebate under the regular price of a new car. The law may legalize by statute or administrative act what may be done by legal agreement.

This statute contained a sufficient declaration of the existence of an emergency. Chapter 781, § 1, of the Laws of 1933 (Ex. Sess.), after pointing out the existence of a national emergency, recites that it is "declared to be the policy of this state to cooperate in the furtherance of the objects and purposes declared in said act of the congress, and each and every provision of this act shall be construed in accordance with the policy so declared, and .

to make uniform the standards of fair competition prevailing in intrastate commerce and industry with those of interstate commerce required by the provisions of the said national industrial recovery act which are applicable in interstate commerce in the state of New York."

The right of a state Legislature to recognize, in this period of economic stress, an emergency, has been authoritatively decided. Home Bldg. & Loan Asso. v. Blaisdell, supra; Nebbia v. People, supra.

The Congress of the United States has frequently reposed wide powers and responsibility in the executive branch of our government, and this legislation has withstood attack. Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; United States ex rel. Turner v. Williams, 194 U. S. 279, 24 S. Ct. 719, 48 L. Ed. 979; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; Ryan v. Amazon Petroleum Corp. (C. C. A.) 71 F.(2d) 1.

The National Industrial Recovery Act was far-reaching in its effect upon industry. Its purpose, to contend with an emergency, is found in title 1, § 1, of the act (15 USCA § 701). To supplement, strengthen, and eliminate any conflicts in carrying out the policies of the government by reason of existing state laws, many states, including New York, have passed industrial recovery laws similar to the national act. The state law of New York was passed with an intent to co-operate with the national act for the general welfare.

The Constitution, as submitted to the states for ratification, did not contain any one article guaranteeing the citizens any rights of "due process of law." It contained very few guaranties of personal rights in any form. Mott, Due Process of Law (1926) (15). The powers of the federal government are limited, and their limit should not be transcended, as stated in McCulloch v. Md., 4 Wheat. (17 U. S.) 316, 421, 4 L. Ed. 579 (1819): "But  *   *   *   the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

The National Industrial Recovery Act as an emergency measure is limited to two years' duration (section 2 (c), 15 USCA § 702 (c). Aside from the purpose of the act as stated, the method by which the act seeks to lessen destructive competition and curb the predatory business practices is first through voluntary co-operation and adjustment amongst the interested parties themselves. In this way the act is primarily a permissive, rather than a mandatory, statute. It accordingly enjoins rather than restricts industry's freedom of action in permitting certain types of collective action designed to promote the purposes of the act. If a certain industry chooses to take advantage of certain of the comprehensive features of the act regarded as beneficial to them, the act then requires that they do certain things designed to benefit the particular trade or industry and the country in general.

The constitutional issues conceded to be involved in testing the validity of the act concerned are its mandatory, as distinguished from its permissive, features. Section 3 (d) of the act (15 USCA § 703 (d) is pertinent in this cause. By section 3 (d) the President is authorized to prescribe a code of fair competition for the trade or industry where abuses inimical to the public interest are prevalent, giving such code the effect and force of a voluntary code. The Recovery Act was enacted under the powers of Congress to regulate interstate and foreign commerce. The power to do so under the Commerce clause of the Constitution (article 1, § 8, cl. 3) must be recognized because of the long line of cases upholding a wide variety of regulatory legislation. Lottery Cases (Champion v. Ames), 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936.

But the question is raised here as to whether Congress has attempted to use the power to regulate interstate commerce as the means of controlling intrastate production. By indirection, local matters are capable of federal control. Houston, E. & W. T. Ry. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, to which reference is made in the plaintiff's brief, denied Congress the power over commerce which is subject to the regulatory powers of

the individual states, and held that the manufacture of goods is not commerce. This was a five to four decision of the Supreme Court, and stands alone in a long line of decisions decided before and since. A series of acts and decisions (United States v. Hill, 248 U. S. 420, 39 S. Ct. 143, 63 L. Ed. 337; Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407), beginning with the Interstate Commerce Act of 1887 (24 Stat. 379) until the Transportation Act of 1927 (44 Stat. 1448), have left little to the argument that products manufactured within the state even when intended to be sent across the state lines are not subject to federal regulation. The Sherman Anti-trust Act of 1890 (15 USCA §§ 1–7, 15 note) initiated regulation by Congress of contracts, combinations, and monopolies in restraint of interstate commerce. The Federal Pure Food and Drug Act of 1906 as amended (21 USCA §§ 1–5, 7–15) barred from interstate commerce foods or drugs not inspected or labeled in accordance with the act. Other illustrations are found in the Meat Inspection Act (USCA title 21, § 71), the Safety Appliance Act (USCA title 45, §§ 1–7), the Employers' Liability Act (USCA title 45, § 51 et seq.), the Mann Act (USCA title 18, §§ 397–404), and the Hours of Service Act (USCA title 45, §§ 61–64). The Hawes-Cooper Act, effective January 1, 1934 (49 USCA § 65) subjects prison-made goods sent from one state to another to the laws of the latter state.

The constitutionality of the application of a prescribed code, as distinguished from a voluntary code, must be determined in accordance with the relations of the particular industry to interstate or intrastate traffic and to the general welfare of the nation, regardless of the fact that the immediate operation of the subject of the code is confined to a particular locality. A state may exercise certain police powers, which seem to be unlimited (Home Bldg. Loan Asso. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481), but Congress may not do so, as there are no federal police powers under the Constitution.

Authoritative decisions of the Supreme Court have considered the doctrine of business affected with the public interest. Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877; Nebbia v. People, supra. But a business which is of little public consequence to-day may become affected with public interest in later years, and a business vital to-day may well become obsolete tomorrow. Thus the regulation may be valid for business of one sort in given circumstances and invalid for another sort or for the same sort of business in different circumstances. The test has always been one of reasonableness, and, applying that test to the instant case, the claim of breach of the Constitution must fail.

The New York State Constitution, art. 3, § 17, provides: "No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act."

The Schackno Law in no manner makes the National Industrial Recovery Act a part of its provisions. It declares the policy of the state and its desire to make uniform the standards of fair competition prevailing in intrastate industry with those standards of interstate commerce required by the provisions of the National Industrial Recovery Act. As stated by section 2 of the Schackno Law (Laws 1933 [Ex. Sess.] c. 781), the filing of the code with the secretary of state regulated intrastate transactions, and nowhere is there an adoption, by statement or indication, of the National Industrial Recovery Act as a part of the act, nor is it made "applicable."

The code is but an administrative product of the executive's application of the National Industrial Recovery Act. It is not a law. By virtue of the Schackno Law it may, when filed, become enforceable under the state statute. The enforcement of the code provisions by the state within its own jurisdiction is no delegation or abdication of the legislative or other state functions as charged. The code as an administrative act of the national government is merely made fully enforceable in intrastate sales. Under the decisions of the New York state courts, the attack against the Schackno Law as a surrender of the state power under article 3, § 17, of the Constitution, has failed.

The state Legislature may provide that it would follow the provisions of the national code, without further investigation as to details of standards such as those set up in the code, in an effort to enforce the policy of Congress within the state in intrastate affairs.

The motion for an injunction is denied.