**UNITED STATES v. JAMES W. McALIS-
TER, Inc., et al.**

**No. 3764–S.**

District Court, N. D. California, S. D.

Nov. 8, 1934.

H. H. McPike, U. S. Atty., and Robert L. McWilliams, Asst. U. S. Atty., both of San Francisco, Cal. (James F. Pinkney, Asst. Counsel, National Recovery Administration, of San Francisco, Cal., of counsel), for the United States.

Erwin C. Easton and Thomas, Beedy, Presley & Paramore, all of San Francisco, Cal., for defendants.

ST. SURE, District Judge.

Upon plaintiff's verified bill of complaint, filed pursuant to section 3(c), title 1, of the National Industrial Recovery Act (15 USCA § 703(c), a temporary restraining order and order to show cause why a temporary injunction should not issue was made by this court, restraining defendants from violating the provisions of subsections (3) and (4) of Division A, and Division B, article IV, of the Code of Fair Competition for the Motor Vehicle Retailing Trade. The application for a temporary injunction came on for hearing upon the return day of the order to show cause, defendants moving to dismiss the bill and to vacate the temporary restraining order. The case was submitted upon plaintiff's bill, defendants' answer, oral evidence, and affidavits presented by respective parties. The National Industrial Recovery Act and the Code of Fair Competition will hereinafter be referred to as the "NRA" and the

"code," respectively. James W. McAlister, Inc., is a corporation organized and existing under the laws of the state of California, and James W. McAlister, individual, is president and general manager of the corporation.

Defendants are engaged in the business of retailing new and used motor vehicles within the city and county of San Francisco, and in distributing for sale new and used motor vehicles to dealers in a large part of the northern section of California, including said city and county, and in servicing, greasing, and repairing new and used motor vehicles; said services including the sale of petroleum products, automobile accessories, tires, and other parts within said city and county. All, or practically all, of the motor vehicles so sold and distributed for sale by defendants are either manufactured out of the state of California, or the parts constituting said motor vehicles are manufactured out of the state, in which latter case they are assembled within the state.

The bill of complaint alleges chronologically the history of the administrative acts of the President and of the Administrator for Industrial Recovery relative to the making and promulgating of the code under the provisions of the NRA. It is further alleged in the bill that "the code makes provision for used car allowances and marketing rules which are to be used by all members of the trade"; that "there was published and issued on December 3, 1933, an official guide establishing the maximum value allowed for used cars (a separate guide for each logical trade area of the United States being issued). Such guide continues to be published and issued every thirty days and is to be recognized as the authority for such allowances. No dealer shall, directly or by subterfuge, accept in trade any used vehicle at an allowance price of more than that set forth in the official publication, and no dealer shall sell a new car at retail for less than the factory list prices, plus certain costs set out;" that the defendants have at all times since the date of its approval had full knowledge of the code and the official guide; that "the defendants, on or about August 18, 1934, caused to be mailed or distributed certain bulletins to all their employees and dealers authorizing them to disregard the provisions of the code and to conduct business upon the same basis that it was conducted prior to the enactment of the code. Defendants state that they intend to and will violate the provisions of said Article IV of the code if they see fit, and further that they will defend without cost any dealer encountering difficulties relative to the enforcement of the code by reason of their following the defendants' policies."

Paragraph X of the bill is as follows: "As set forth in Section I, Title I of the National Recovery Act [15 USCA § 701], a national emergency, productive of widespread unemployment and disorganization of industry which burdens interstate and foreign commerce, affects the public welfare and undermines the standard of living of the American people, existed at the time of enactment of said Act, and still exists. The Motor Vehicle Retailing Trade has been and is particularly affected by this emergency and until the approval of its Code was in a chaotic condition with widespread unemployment among persons formerly employed in the trade, excessively low wages paid to labor and with excessively long hours of labor and numerous bankruptcies, receiverships and failures among members of the trade and with the greater portion of its members doing business at a loss. The trade was generally prey to vicious and unfair trade practices resulting in great damage and injury to the public, to the trade, as well as to the credit structure of the United States, and in many important cities of the United States the trade was subject to illegal practices by racketeering members. These chaotic conditions were due principally to a ruthless price war which became progressively prevalent and devastating in the trade throughout the country during a period prior to the approval of the Code, and which, were it not for the provisions of the Code, would still be in progress. Due principally to said provisions of the Code, the trade is now making rapid progress toward emergence from said chaotic condition and toward recovery of a healthy condition, which progress will be erased and the benefits and advantages thereof will be lost if said provisions are not immediately enforced and permitted to become effective."

It is further alleged that the transactions in and by which the defendants threaten to violate the code will affect interstate commerce in various ways here unnecessary to enumerate; that by reason of the facts stated in the bill the acts which defendants threaten to do will increasingly cause an "obstruction of the free flow of interstate commerce and the diminishing of the amount thereof with respect to members of the trade engaged in the interstate purchase of motor vehicles and accessories"; that the destruction of the national credit structure of the United States and a reduction of revenue through normal channels will ensue; that "by said threatened

violations defendants will increasingly cause most of the members of the motor vehicle retailing trade selling new cars or accepting used cars in trade in and about the City and County of San Francisco, California, to similarly violate said provisions of the code, with the result that price wars will ensue in and around the City and County of San Francisco, California, which will spread to other areas and other states and will bring about a return of the chaotic conditions described in paragraph X of this bill, with its consequent demoralization and dislocation of interstate commerce, its injurious effect on the value of natural products, on monetary values and on the credit system of the country, and its jeopardizing of the general welfare"; that "the example of defendants' violation of the National Industrial Recovery Act and of the Code will cause widespread dissatisfaction among members of the motor vehicle retailing trade and many of those now obeying the law in the present emergency will be encouraged to violate from the desire to profit at the expense of the cooperation of other members of the industry."

Defendants deny membership in the National Automobile Dealers' Association, which presented to the President for approval the code, and which Association is recognized therein; deny receiving notice of the hearing in Washington on September 15, 1933, on the adoption of the code. But defendants admit that they conducted their business under the code for several months before concluding to resist its provisions. Mr. McAlister says, in an affidavit, that he "did not take any affirmative action prior to this time for the reason that affiant was requested by his friends to give the code an opportunity for a short period of time before making any protest." In his oral testimony, Mr. McAlister's principal complaint against the code was that one or more of his competitors, while publicly pretending to live up to its provisions, were making secret allowances for used cars in "trade-in" transactions, to the detriment of his company's earnings and the demoralization of its sales organization.

Defendants contend that the NRA does not apply to their business for three reasons:

"First, the defendants are not guilty of any unfair practices or competition within the meaning of the National Industrial Recovery Act;

"Second, that the National Industrial Recovery Act does not contemplate price fixing; and

"Third, that the defendants are not engaged in interstate business; that the business is purely local; that none of the acts complained of have any effect upon interstate commerce, nor do they tend to obstruct interstate commerce; and that the transactions complained of, if they have any effect at all upon interstate commerce, have only an accidental, indirect, remote and casual effect. In other words the acts are not a direct burden upon interstate commerce."

It is further urged that should the court find that the acts complained of do affect interstate commerce, within the meaning of the NRA, then the NRA is in violation of several provisions of the Constitution of the United States.

The automobile industry in the United States has grown, in the period of thirty-eight years, from a minor industry to one that occupies a position in the commerce of the country exceeded only by the retail distribution of food. As shown by the affidavit of Mr. K. J. Ammerman, Deputy Administrator in the National Recovery Administration: "In 1895 four motor vehicles were registered in the United States and at that time an automobile was considered a luxury. In 1930, the industry had developed to a point where the registration of motor vehicles is shown to be 26,545,281, and instead of being a luxury an automobile today is considered a necessity. It is vitally important to the conduct of every business enterprise in the United States. It is responsible for the development of the State, and is directly or indirectly responsible for employing one person out of every eleven workers. The automobile industry is divided into two distinct divisions, each considered a separate industry, but each dependent upon the other to a large extent; the automobile manufacturer who manufactures and produces new cars and the motor vehicle retail dealer who distributes to and services new motor cars for the consumer. Unless and until the distributing agency of the Motor Vehicle Industry is efficiently and profitably conducted the effect will be adversely reflected upon the automobile manufacturer."

Following the depression, the industry found it impossible to control its own activities through organizations, and was showing signs of disintegration. "When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry." Mr. Chief Justice Hughes in Appalachian Coals, Inc., v. United States, 288 U. S. 344, 372, 53 S. Ct. 471, 478, 77 L. Ed. 825. Emergency governmental supervision was the

means of saving the motor vehicle retailing industry.

"Probably the greatest evil confronting the trade," continues Mr. Ammerman, "was in connection with the acceptance of a used car as a credit allowance, in excess of its actual resale value, on the purchase of a new car: In the past the only methods of determining the resale value of a used car accepted in trade on a new car was on the basis of individual opinions, or by the use of appraisal books. These appraisal guides, as published, were based on unsupported reports furnished by some of the dealers. In this manner they were able to establish an allowance price to suit their own desires, and the consuming public was left with no available remedy except to deal with those men in the manner prescribed by them, to their mutual detriment. The industry felt that this was discriminating against the consumer and ruining the dealer. In an effort to abolish this evil, protect the dealer, protect the public, and insure an adequate return on sales, the dealers proposed a system by which the consumer alone established the allowance or appraisal price on used cars sold or traded in to retail dealers. This was by separating the nation into definitely identified trading areas. All dealers within that trade area furnished an organization, named by the dealers, with sworn reports showing the exact sales price received by them on each separate make and model of car. By using these figures, and in the manner prescribed by the code, an average was struck determining the average used car allowance granted by dealers during a given period of time. In this manner the consuming public and not the dealer determined the maximum price to be allowed when the used car was used as a medium of exchange. * * * The used car market formerly was a minor activity among the retail dealers, but today is of major importance."

Some persons are distrustful of the national recovery legislation because it is new and unprecedented. Professor Douglas B. Maggs, in an article in the University of Chicago Law Review on the Constitution and Recovery Legislation, volume 1, No. 5, says that there is nothing novel in their conduct. "A generation ago, conservatives reacted similarly to workmen's compensation acts and other unprecedented legislation. Speaking for a majority of the Supreme Court, Mr. Justice McKenna protested against this attitude in German Alliance Insurance Co. v. [Lewis] Kansas, 233 U. S. 389, 409 [34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189] * * *: 'Against that conservatism of the mind, which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government—state and National—has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the Constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired.'"

Whatever may be said upon the burning and debatable questions of social policy agitating the public mind since the passage by Congress of the acts to encourage industrial recovery, there is no doubt that the used-car business, prior to the adoption of the code, was at its lowest ebb. Before the depression, unfair trade practices had shaken public confidence, and when the financial debacle came the business was facing destruction. All this, which is matter of common knowledge, made reformation necessary. As shown by article I, the code was "adopted for the purpose of * * * eliminating unfair trade practices to the end of rehabilitating the Motor Vehicle Retail Trade and enabling it to do its part toward establishing that balance of trades which is necessary to the restoration and maintenance of the highest practical degree of public welfare." And in article IV, division "A. Used Car Allowance," it is said: "In an effort to prevent sales below cost, heretofore due to unfair competition that has resulted in the dissipation of the large part of the capital originally in this trade and has accumulated large losses since 1926, this trade agrees to regulate itself so as to return profit possibilities and support increased wages and shortened hours."

The NRA provides that when codes for the different industries are adopted, their provisions "shall be the standards of fair competition for such trade or industry." Also that "any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition." Section 3 (b), 15 USCA § 703 (b).

Clearly, as defendants' business comes within the provisions and regulations of the NRA and the Code of Fair Competition adopted for the motor vehicle retailing trade, any violation of the standards therein set out is unfair competition.

The provision in the code fixing maximum price allowances for used cars does not deprive defendants of their property without due process of law. Congress having declared its policy to encourage national industrial recovery and to foster fair competition, it was logical that means should be found to effectuate it. In an endeavor to correct trade abuses and save the business, the code regulations relative to used-car allowances were adopted. Under all of the circumstances, these regulations are reasonable, and so far as perverse human nature will permit, they are accomplishing their purpose.

While the decision of the Supreme Court in the case of Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, is based upon the police power of a state, much of its reasoning is applicable to the facts in the instant case. Mr. Justice Roberts, author of the majority opinion for the Supreme Court, says: "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest." Page 523 of 291 U. S., 54 S. Ct. 505, 510. "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases." Page 527 of 291 U. S., 54 S. Ct. 505, 512. "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the Legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U. S. 197, 337, 338, 24 S. Ct. 436, 437, 48 L. Ed. 679. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal." Page 537 of 291 U. S., 54 S. Ct. 505, 516. "The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Pages 538, 539 of 291 U. S., 54 S. Ct. 505, 516.

Defendants contend that their business is purely local in character and in no way directly burdens interstate commerce. In their brief they argue: "The automobiles purchased by the defendants are at rest when purchased. As was stated in their answer the Chrysler automobiles are shipped by Chrysler Corporation to the defendant, James W. McAlister, Inc., sight draft and bill of lading attached, title reserved in Chrysler Corporation. The defendant pays for said automo-

biles at the bank and depositary of Chrysler Corporation in California. The automobiles are then taken from the common carriers to the warehouse of James W. McAlister, Inc., repaired, if needed, serviced and put in shape for sale and delivery. They are then distributed to the various distributors throughout the northern part of the State of California and to the retail stores of James W. McAlister, Inc. The Plymouth automobiles are purchased entirely within the State of California from Plymouth Motors Corporation at Los Angeles, are paid for at the Wells Fargo Bank & Union Trust Company, the depository of Plymouth Motors Corporation in the same manner and in the same way as Chrysler automobiles. The Plymouth automobiles are also handled in the same manner."

Beyond dispute the automobile industry is one of the most important in the country, intimately touching the lives of the people in all of their concerns. The evidence shows that many other industries are dependent upon it; that within recent years the industry in all of its various units progressively declined until it was demoralized and on the verge of ruin; that unemployment was great in the industry; that burdensome competitive practices growing out of the depression caused the condition in which the industry found itself when the National Recovery Act was enacted; that the problem confronting legislators was national in scope and could not be effectively regulated by the states; that evil competitive practices were burdening interstate commerce; that the transportation and sale of automobiles constitute a very large part of interstate commerce.

 It is fitting that I reiterate what I said in United States v. Calistan Packers (D. C.) 4 F.Supp. 660, about the power of Congress to regulate interstate commerce. Such power is granted in broad terms and should not be restrictively construed. Rather it must be construed to give the Congress the power to regulate any and all commerce which may seriously affect the interstate trade. This court, with propriety, cannot make the narrow holding that the legislative body, under this and analogous statutes, is without power to regulate intrastate commerce as a proper means of achieving the desired regulation of the interstate commerce. In this and other respects this power to regulate must be construed to effectuate the board purposes of the constitutional grant and of the national policy.

Governmental price fixing, when confined to transactions in interstate commerce, cannot be held unreasonable means for securing the purpose of the NRA. United States v. Spotless Dollar Cleaners, Inc. (D. C.) 6 F. Supp. 725.

Also see Richmond Hosiery Mills v. Camp (D. C.) 7 F.Supp. 139; Victor v. Ickes, Supreme Court, District of Columbia, Dec. 1, 1933; Southport Petroleum Co. v. Ickes, Supreme Court, District of Col., Aug. 15, 1933; United States v. Shissler (D. C.) 7 F.Supp 123; United States v. Kostendt (before Special Master Sayres), D. C. Mich., March 15, 1934, unreported; State of Texas v. Standard Oil Co., 98th D. C., Travis County, Texas, Oct. 12, 1933; Spielman Motor Sales Co. v. Dodge (D. C. S. D. N. Y. Oct. 5, 1934) 8 F. Supp. 437 (three-judge statutory court).

Mr. Justice Brewer, in Re Debs, 158 U. S. 564, 591, 15 S. Ct. 900, 909, 39 L. Ed. 1092, said: "Constitutional provisions do not change, but their operation extends to new matters, as the modes of business and the habits of life of the people vary with each succeeding generation. * * * Just so is it with the grant to the national government of power over interstate commerce. The constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

Mr. Chief Justice Hughes, in Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 442, 54 S. Ct. 231, 242, 78 L. Ed. 413, 88 A. L. R. 1481, said: "If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation."

Replying generally to the constitutional questions raised by the defendants, I quote from an opinion of Mr. Chief Justice Marshall in Fletcher v. Peck, 6 Cranch (10 U. S.) 87, 128, 3 L. Ed. 162, as follows: "The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its pow-

ers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Both motions will be denied, and plaintiff's application for temporary injunction will be granted.