**UNITED STATES v. A. L. A. SCHECHTER POULTRY CORPORATION et al.**

**No. 323.**

Circuit Court of Appeals, Second Circuit.

April 1, 1935.

618

Joseph Heller, of New York City (Joseph Heller and Jacob E. Heller, both of New York City, of counsel), for appellants.

Walter L. Rice, Sp. Asst. to Atty. Gen., Harold M. Stephens, Asst. Atty. Gen., Carl McFarland and Henry W. Edgerton, Sp. Assts. to Atty. Gen., J. William Fulbright and H. Stewart McDonald, Jr., Sp. Attys., U. S. Department of Agriculture, both of Washington, D. C., and Raymond J. Heilman, Asst. Counsel, National Recovery Administration, of Washington, D. C., for the United States.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The appellants were convicted on 19 counts of an indictment charging crimes in 60 counts. They were convicted of: (Count 1) Conspiracy to commit offenses against the United States by violating the National Industrial Recovery Act and provisions of the Code of Fair Competition for the Live Poultry Industry of Metropolitan New York; (count 2) violation of article VII, § 2, of the Code, prohibiting purchase or sale of poultry unfit for human consumption; (counts 4 and 5) violation of article VII, § 22, prohibiting the sale of poultry not inspected and approved in accordance with the ordinances and regulations of New York City; (counts 24 to 33, inclusive) violations of article VII, § 14, prohibiting the use of any method of slaughtering other than straight killing; (counts 38 and 39) violations of article VIII, § 3, and article VI, §§ 1 and 2, requiring weekly reports on daily range of prices and volume of sales; (count 46) violation of article IV, §§ 1 and 2, requiring a minimum wage of 50 cents per hour to be paid in lawful currency; (count 55) violation of article III, § 1, providing a maximum of 48 hours per week for slaughterhouse employees; and (count 60) violation of article VII, § 15, prohibiting the sale of live poultry to any person not licensed as required by the New York City ordinances and New York City Board of Health rules and regulations.

Appellants are wholesale marketmen engaged in the poultry business in the borough of Brooklyn, New York City. Their purchases were ordinarily made in the market in New York City, but sometimes in Philadelphia, Pa. The poultry bought by them is taken directly to their slaughterhouse markets and sold to retail dealers within 24 hours. The shares of stock of the corporations named in the indictment were owned, and the corporations controlled, by the individual appellants.

The evidence at the trial established to the satisfaction of the jury that the poultry industry in the New York City area was beset with evil trade practices. The New York City market is the largest in the country and dominates the industry. In 1930, sales of 224,000,000 pounds of poultry were made in New York City; in 1933, 190,000,000 pounds were sold. This large volume, with the consequent market domination, places New York City in the position of being the medium by which prices for poultry throughout the country are measured. The markets in other large cities, as Chicago and St. Louis, maintain their prices in accordance with those current in New York, the difference being determined by the cost of freight and handling, and as to whether the poultry is coming from the west to the east, or the south to the north, the direction of flow depending upon the season. The farmer's price reflects the price current in the New York market, so that the demoralization of price structure in New York produces a similar situation, not only in other markets throughout the country, but also in all poultry farming

areas. It reduces the price received by the interstate shipper and by the farmer. To the farmer, poultry is a cash, as distinct from a seasonal, crop. He sells day by day for cash, and this provides the means for purchasing current supplies, so that a cheap market for poultry entails a falling off in the daily purchases of the farmer. From 1927 to 1933, there was a decrease in the wholesale value of poultry sold of approximately 53 per cent., or $30,000,000. The price per pound was reduced from approximately 30 cents in 1929 to 14 cents in 1933.

'The practices of selling below cost, selective killing, bringing in uninspected poultry from outside the state, selling poultry unfit for human consumption, making possible a ready market for diseased and inferior poultry, were assigned as evils resulting in loss in the volume of business. New York presented a market for diseased poultry, and the evidence shows that diseased poultry was shipped almost exclusively to New York. Live poultry is a perishable commodity, and the presence of a few diseased chickens in a car frequently infects the whole carload. Such poultry, when sold, is necessarily disposed of through misrepresentations as to its condition, and causes distrust and a reluctance to purchase on the part of consumers. The presence of diseased poultry in the market caused a demand because of its cheap price. It narrowed the price range because good poultry, which could otherwise sell at a high price, had to meet the competition of the diseased poultry and drop in price. The avoidance of poultry inspection was a relatively simple matter in New York, and this was a material circumstance in conditioning the shipment of unfit poultry to that market. Poultry certain to be condemned in other markets because of its diseased condition, was shipped to New York. Lack of inspection requirements also induced fraudulent practices in the course of interstate shipment—such as overfeeding the poultry to increase its weight. The practice of selective killing, rather than straight killing, resulted in price cutting, and a lowering of prices received by the farmers and the interstate shippers. The control of prices by which poultry can be sold to the consumer is determined not only by the cost of the poultry but also by the wages paid to the employees in the poultry slaughterhouses.

The appellee argues that the payment of lower wages permits the employer to sell at a lower price than if he paid higher wages. Competition is thus affected. Lower wages resulted in price cutting, which in turn affects interstate commerce. It was also established that sales by wholesale marketmen to unlicensed operators, not subject to Health Department supervision, were a further cause of the industry's unfair practices. Such operators, being irresponsible and not disposed to make the necessary expenditures for the maintenance of sanitary places of business, sold at cut prices and initiated the sales of unfit poultry. There was evidence that these conditions brought about an industrial demoralization which, with all its adverse national consequences, needed correction and betterment. It is argued that no improvement was possible unless all the evil practices in the industry were controlled, and it was to accomplish this result that the Live Poultry Code for the Metropolitan area was adopted and approved.

■ Congress had the power, under the Commerce Clause (art. 1, § 8, cl. 3), to regulate transactions in interstate commerce, and its power also extends to all transactions which substantially burden or affect such commerce. Local 167, International Brotherhood of Teamsters v. United States, 291 U. S. 293, 54 S. Ct. 396, 398, 78 L. Ed. 804; Thornton v. United States, 271 U. S. 414, 46 S. Ct. 585, 70 L. Ed. 1013; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. And whenever an intrastate activity substantially and directly burdens or interferes with the free flow of interstate commerce, under the Commerce Clause, Congress has the power to remove the obstruction. Local 167, Brotherhood of Teamsters v. United States, supra; Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 478, 67 L. Ed. 839. Interference "with the unloading, the transportation, the sales by market men to retailers, the prices charged, and the amount of profits exacted operate substantially and directly to restrain and burden the untrammelled shipment and movement of the poultry while unquestionably it is in interstate commerce." Local 167, Brotherhood of Teamsters v. United States, supra. To the extent that the sale of unfit and uninspect-

ed poultry diverts healthy poultry from the New York market, and brings about the sale of inferior poultry, and demoralizes the price, this rule has application, for the burden is no less substantial and direct. Thornton v. United States, supra; Board of Trade of Chicago v. Olsen, supra. In the Olsen Case, the court said: "The question of price dominates trade between the states. Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it." So the fraudulent shipment of inferior poultry in interstate commerce is sufficiently substantial and direct to warrant federal regulation. United States v. Ferger, supra. The power to legislate as to general trade practices merely affecting interstate commerce, though never so broadly exercised, was recognized in the earlier cases. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. Amer. Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663. Transactions or violations, which amount to more or less constant practice, and which threaten to obstruct or to unduly burden the freedom of interstate commerce, are within the regulatory powers of Congress under the Commerce Clause. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Brooks v. United States, 267 U. S. 432, 45 S. Ct. 345, 69 L. Ed. 699, 37 A. L. R. 1407.

■ Congress stated in section 1 of the National Industrial Recovery Act (15 USCA § 701) that its purpose was to promote interstate commerce. The national economic emergency, hereinafter referred to, has made interstate commerce more sensitive than normally to unfair trade practices. Trade practices which, in normal times, would have had only an indirect and incidental effect upon interstate commerce, may substantially burden interstate commerce during a period of overproduction, unfair competition, and a reduced purchasing power. And, as pointed out, emergency does not create the power, but it may furnish the occasion for the exercise of the power conferred by the Constitution. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. The prohibition of the sale of unfit poultry in the state of destination when that state is the major market of the nation is an especially direct and appropriate means to protect interstate commerce from deception or spread of disease affecting it. Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878; Railroad Commission of Wisconsin v. Chicago, B. & Q. Ry. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086.

Appellants contend that the act as a whole, and section 3 thereof particularly, is unconstitutional in that it is an invalid delegation of legislative power by Congress to the President.

The Constitution provides that: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Article 1, § 1. And further it provides that the Congress is empowered "to make all Laws which shall be necessary and proper for carrying into Execution" all its general powers. Article 1, § 8, cl. 18.

By the National Industrial Recovery Act, Congress delegated to the President the power to approve various Codes of Fair Competition. The constitutional validity of this delegation of power is brought into question. Section 1, title 1 of the act (15 USCA § 701), contains a "Declaration of Policy," reading: "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and other-

wise to rehabilitate industry and to conserve natural resources."

Section 3 (a, b), 15 USCA § 703 (a, b), provides for Codes of Fair Competition, and their approval by the President, their conditions, restrictions, and exemptions, and for the approval of the Codes to have the effect of establishing standards of fair competition, as found in the margin.*

We think this was a lawful exercise of a lawfully delegated power. In Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 355, 48 L. Ed. 525, the court said: "We may say of the legislation in this case, as was said of the legislation considered in Field v. Clark [143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294], that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

It has been often stated that the legislative powers vested in Congress by the Constitution must be exercised by Congress alone, and cannot be delegated to any other branch of the government. This proposition has been reannounced in Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 248, 79 L. Ed. ——. It was there said: "The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." The court held that section 9 (c) of the National Industrial Recovery Act (15 USCA § 709 (c), which authorized the President to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn in excess of state quotas, constituted an unconstitutional delegation of legislative power, and was, therefore, void. This decision was based upon the absence of any declaration of policy or standard of action and the fact that Congress required no findings to be made by the President in the exercise of the authority given him. The delegated authority was unconditional; the course of the President's action was governed by no criterion. So far as section 9 (c), 15 USCA

---

* "(a) Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, represented by the applicant or applicants, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title: Provided, That such code or codes shall not permit monopolies or monopolistic practices: Provided further, That where such code or codes affect the services and welfare of persons engaged in other steps of the economic process, nothing in this section shall deprive such persons of the right to be heard prior to approval by the President of such code or codes. The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the pub-

lic interest, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared.

"(b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof. Any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method for competition in commerce. * * *"

"In pursuance of the authority vested in him by Congress through the above section, the President, on April 13, 1934, approved the Live Poultry Code. This was done after joint hearings conducted by the A. A. A. and the I. R. A. The Secretary of Agriculture, the Industrial Recovery Administrator and the President found that the provisions of the Code complied with all the standards set up by the N. I. R. A. The President, in his Executive Order of Approval of the Code, made special findings that the Code complied with all the provisions of Sec. 2(a) and the other pertinent sections, and that the Code 'will tend to effectuate the policy of Congress as declared in section 1 of title I of the Act.' "

§ 709 (c), was concerned, the court found that the policy was subject to the will of the President. The declaration of the policy, in section 1 of the act (15 USCA § 701), contained no standard of action for section 9 (c), and section 1 was "simply an introduction of the Act, leaving the legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections."

But section 3 (a) and (b), 15 USCA § 703 (a) and (b), here considered, is not subject to the same deficiencies. In Buttfield v. Stranahan, supra, an act authorized the Secretary of the Treasury, upon the recommendation of a board, to "establish uniform standards of purity, quality, and fitness for consumption of all kinds of teas imported into the United States." See 21 USCA § 43. It was held constitutional because the court found that Congress had fixed a "primary standard," delegating to the Secretary of the Treasury only the duty to effectuate the declared legislative policy. In The Brig Aurora v. U. S., 7 Cranch. 382, 3 L. Ed. 378, it was held that Congress might make the revival of an act depend upon an Executive Proclamation showing that the President had made certain findings. In Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294, the court found that the "suspension of an act upon a contingency to be ascertained by the President, and made known by his proclamation," the suspension being "absolutely required when the president ascertained the existence of a particular fact," was not law making on the part of the President. The will of Congress was expressed, its exercise being dependent upon the declaration of the existence of a fact. In Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. Ed. 549, an act of Congress providing for the deportation of aliens found by the Secretary of Labor to be "undesirable residents" was held a constitutional delegation of legislative power. "Undesirable residents" was there found to have set up an adequate standard of action. In J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 351, 72 L. Ed. 624, the President's authority to increase or decrease tariff duties when such action would serve "the public interest" was held constitutional. The court expressed the philosophy behind such delegation: "Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an executive." In Federal Radio Commission v. Nelson Bros. Co., 289 U. S. 266, 53 S. Ct. 627, 636, 77 L. Ed. 1166, 89 A. L. R. 406, the Radio Act of 1927, which gave the Radio Commission authority to grant licenses "as public convenience, interest or necessity requires," was considered. The court found a declaration of policy and the establishment of a standard by Congress, and that consequently the authority granted was not unlimited but was to be exercised in conformance with this standard.

The principle of these decisions is that without delegation the powers conferred upon Congress by the Constitution would often be incapable of exercise. Congress would be factually impotent. To deny the right to delegate would be "'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 374, 51 L. Ed. 523. This principle was reannounced in the Panama Refining Co. Case, supra; the court saying: "Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply." To be sure "there are limits of delegation which there is no constitutional authority to transcend." Panama Refining Co. Case, supra. The limits are that Congress, and Congress alone, can declare the legislative policy; that it alone can point out the result to be accomplished. If such is done, it cannot be said that the delegation is unlawful. J. W. Hampton, Jr., & Co. v. United States, supra. The delegated power, if confined within proper limits, if the circumstances calling for its exercise and restraint are adequately confined, is lawful. United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A.

L. R. 1481. It was the absence of this necessary declaration of policy, the erection of a standard and criterion, which rendered the attempted delegation of power in section 9 (c) of the National Industrial Recovery Act (15 USCA § 709 (c) invalid in the Panama Refining Co. Case, supra.

In the instant case, the authority delegated to the President, by section 3 (a) and (b) of the National Industrial Recovery Act (15 USCA § 703 (a) and (b), is confined within constitutional limits. Looking to the statute to see whether Congress had declared a policy with respect to the subject, and whether it has set up a standard for the President's action, and whether Congress has required any finding by the President in the exercise of the authority, we find that section 3 (a) and (b) discloses all the requirements demanded by the principle expounded in the Panama Refining Co. Case, supra. A policy is declared, standards set up, and the findings of fact required. The authorization to approve Codes is dependent upon a finding that they "will tend to effectuate the policy" declared by the act. The policy of the act, though but broadly stated in section 1 (15 USCA § 701), is more specific throughout the act. Congress desired to "reduce and relieve unemployment, to improve standards of labor," "to increase the consumption * * * by increasing purchasing power." Section 4 (b), 15 USCA § 704 (b), gives the President power to act where he finds "destructive wage or price cutting or other activities contrary to the policy" of the act. Findings by the President were made a condition precedent to action by him, and specific provisions of limitation were declared. Not only were standards set up, but definite restrictions were placed upon the exercise of his delegated power. He was not himself to determine policies; there was no grant to the Executive of any roving commission to inquire into evils and then, upon discovering them, do anything he pleases.

That the standard is broad, that the limitations are not too confining, that the scope of power invested in the President is of great magnitude, is a necessary and essential factor if the results sought to be accomplished by Congress are to be attained. Congress desired that all business compete on a fair basis, and that obstructions to commerce be removed, that the productive capacity of our industries be more fully utilized, that the consumption of products be increased, and that industry be rehabilitated. The project, the complexity of conditions, presented a situation with which Congress was powerless to contend without delegating to some other department the power to attend to the innumerable details thereof.

Congress declared the emergency, declared its purpose and will, and gave to the President the power to exercise the means deemed necessary by it to achieve the desired end. His power to approve Codes was, however, limited to those which he found (a) admitted equitably to membership in the association all those engaged in the same trade or industry; (b) were submitted by an association truly representative of the trade or industry; (c) would not oppress or discriminate against small enterprises; (d) would not promote monopolies; (e) would give employees the right to organize and bargain collectively; (f) would insure compliance by an employer with maximum hours of labor and minimum wages; and (g) would tend to effectuate the policy of the act.

This section was an effective means of the congressional exercise of its constitutional functions. It was both flexible and practicable. The President was to make detailed regulations in conformance with the general standards in order that the congressional purpose might be realized. Thus we have a valid delegation.

Error is assigned for the refusal to sustain the demurrer to counts 4, 5, and 60 because ordinances and regulations of the city of New York therein referred to were not pleaded. Section 22 of the Code prohibits the sale of live poultry which has not been inspected and approved in accordance with the rules, regulations, or ordinances of the particular area. These counts deal with this subject without reference to the particular provisions of the city ordinances. Judicial notice may be taken of these provisions by the court. Martin's Adm'r v. B. & O. R. R., 151 U. S. 673, 14 S. Ct. 533, 38 L. Ed. 311; Kaye v. May (C. C. A.) 296 F. 450. The Poultry Code which will be judicially noticed by this court (Thornton v. United States, supra) contemplates inspection in accordance with the Sanitary Code (§ 22). Since judicial notice is taken, it was unnecessary to plead such laws. Pennington v. Gibson, 16 How. (57 U. S.) 65, 81, 14 L. Ed. 847.

Appellants argue that there is no evidence to warrant the conviction for con-

spiracy. Upon examination of the record it will be found that count 1 of the indictment is amply supported. It warrants the conclusion that there was a concerted and deliberate plan on the part of the appellants to engage in the practice of selling poultry unfit for human consumption—to conceal such sales from the Code Authority, and to violate the other substantive counts of the indictment for which they have been found guilty—sales of unfit poultry; sales of uninspected poultry; violation of straight killing; failure to make sales reports; sales to persons not licensed.

The majority of the court are of the opinion that count 46 (violation of the Code provisions as to wages), and count 55 (as to hours per week for slaughterhouse employees), cannot be sustained. Each of the counts of this indictment must stand upon its own footing. These provisions of the Code forbade employment for more than 48 hours per week and required a minimum wage of 50 cents per hour. These counts are invalid because they have no direct concern with interstate commerce. They were the wages paid at the slaughterhouses to employees not directly engaged in interstate commerce; the number of hours of labor per week and the wages paid cannot be said to affect interstate commerce; they may affect intrastate commerce. Therefore the conviction on counts 46 and 55 are reversed. The evidence fully sustained the convictions on all the other counts of the indictment.

We have considered the other errors assigned and find no justification for reversal.

Reversed in part; affirmed in part.

L. HAND, Circuit Judge, concurs in separate opinion.

CHASE, Circuit Judge, concurs, and concurs in Circuit Judge L. HAND'S opinion.

L. HAND, Circuit Judge (concurring).

I am one of the majority who think that counts 46 and 55 should be reversed, and the question at stake has enough importance to justify a statement of my reasons. It is always a serious thing to declare any act of Congress unconstitutional, and especially in a case where it is a part of a comprehensive plan for the rehabilitation of the nation as a whole. With the wisdom of that plan we have nothing whatever to do; and

were only the Fifth Amendment involved I should be prepared to read the powers of Congress in the broadest possible way. Moreover, the phrase "fair competition" seems to me a definite enough cue or ground plan for the elaboration of a code. Federal Trade Commission v. R. F. Keppel & Bro., 291 U. S. 304, 54 S. Ct. 423, 78 L. Ed. 814; Frischer & Co. v. Elting, 60 F.(2d) 711 (C. C. A. 2); Sears, Roebuck & Co. v. Fed. Trade Comm. (C. C. A. 7) 258 F. 307, 6 A. L. R. 358. Assuming that the preamble of the whole statute will not serve alone (Panama Refining Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. Ed. ——), practices generally deemed unfair in any trade may I think be made the basis of a delegated power, which is obliged to conform to the varying needs of many industries. But the extent of the power of Congress to regulate interstate commerce is quite another matter and goes to the very root of any federal system at all. It might, or might not, be a good thing if Congress were supreme in all respects, and the states merely political divisions without more autonomy than it chose to accord them; but that is not the skeleton or basic framework of our system. To protect that framework there must be some tribunal which can authoritatively apportion the powers of government, and traditionally this is the duty of courts. It may indeed follow that the nation cannot as a unit meet any of the great crises of its existence except war, and that it must obtain the concurrence of the separate states; but that to some extent at any rate is implicit in any federation, and the resulting weaknesses have not hitherto been thought to outweigh the dangers of a completely centralized government. If the American people have come to believe otherwise, Congress is not the accredited organ to express their will to change.

In an industrial society bound together by means of transport and communication as rapid and certain as ours, it is idle to seek for any transaction, however apparently isolated, which may not have an effect elsewhere; such a society is an elastic medium which transmits all tremors throughout its territory; the only question is of their size. In the case at bar such activities as inspecting the fowls after they have arrived, licensing dealers, and requiring reports, are directed at least in part to the control of their importation, and it is not necessary that they should impinge directly upon the importation itself. So

much was certainly decided as to this very industry in Local 167, International Brotherhood, v. U. S., 291 U. S. 293, 54 S. Ct. 396, 78 L. Ed. 804. The "straight killing" rule is of the same kind; it compels a grading of the fowls at shipment and so determines how they shall be cooped and carried. But the regulation of the hours and wages of all local employees, who turn the fowls into merchantable poultry after they have become a part of the domestic stock of goods, seems to me so different in degree as to be beyond the line. No one can indeed deny the prosecution's argument that hours and wages will in fact influence the import of the fowls into the state; and there are instances in which purely intrastate activities are so enmeshed with interstate that they must be included in interstate regulation, else none at all is possible. That is the case with railway rates. Houston, E. & W. T. R. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Railroad Commission of Wisconsin v. Chicago, B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458, was of the same kind. There is no such intimate connection here. Again, the hours and wages of railway workmen may be regulated. Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Baltimore & O. R. R. Co. v. Interstate Commerce Commission, 221 U. S. 612, 31 S. Ct. 621, 55 L. Ed. 878. So too the other conditions of their employment. Texas & N. O. R. Co. v. Brotherhood of Railway Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034. But this is limited to those actually conducting transportation, where the connection is as close as possible. The employees of these defendants were not engaged in transportation. Finally, there are decisions like Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, and Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, of which all that can be said is that the connection between the intrastate transactions regulated and interstate commerce was found to be close enough to serve. It would be, I think, disingenuous to pretend that the ratio decidendi of such decisions is susceptible of statement in general principles. That no doubt might give a show of necessity to the conclusion, but it would be insincere and illusory, and appears formidable only in case the conclusion is surreptitiously introduced during the reasoning. The truth really is that where the border shall be fixed is a question of degree, dependent upon the consequences in each case.

The only ground here for bringing hours and wages within the scope of Congress' power is because the raw material on which the men work is substantially all imported into the state; they make dressed poultry out of live fowls. If Congress can control the price of their labor, I cannot see why it may not control the rent of the buildings where the fowls are stored, the cost of the feed they eat while here, and of the knives and apparatus by which they are killed and dressed. All these are necessary factors in the product and all have as much and as little effect upon the importation of the fowls to be killed and dressed as the labor, which is indeed little more than half the cost. There comes a time when imported material, like any other goods, loses its interstate character and melts into the domestic stocks of the state which are beyond the powers of Congress. So too there must come a place where the services of those who within the state work it up into a finished product are to be regarded as domestic activities. Industrial Ass'n of San Francisco v. U. S., 268 U. S. 64, 45 S. Ct. 403, 69 L. Ed. 849. Generally the two will coalesce. Work upon material become domestic, can scarcely be other than domestic work; in this it differs from inspection and its ancillary accompaniments. For although inspection is immediately concerned with goods that have arrived, they are ordinarily still in transit; and moreover even were they not, the purpose is directly to control the importation of future goods, like the purpose of the conspiracy in Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791. But labor done to work up materials begins only after the transit is completed in law as well as in fact, and it is not directed towards the importation of future materials; it is a part of the general domestic activities of the state and is as immune as they from congressional regulation.

CHASE, Circuit Judge, concurs in this opinion.