Marcia M. BRYANT, Appellant,

v.

**LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts Corporation, Appellee.**

Marcia M. BRYANT, Appellant,

v.

**CONNECTICUT FIRE INSURANCE COMPANY, a corporation organized under the laws of the State of Connecticut, Appellee.**

Nos. 12731, 12732.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 2, 1968.

Decided Feb. 20, 1969.

against Connecticut Fire Insurance Company ("Connecticut") under the uninsured motorist provision of the policy of her mother, whose car plaintiff was driving at the time of the accident. The two suits were consolidated below for trial before a jury. Upon a determination by; the jury that Liberty had properly invoked the defense of non-cooperation on the part of Evans, judgment was entered in favor of Liberty. Judgment was also entered in favor of plaintiff against Connecticut in the sum of $15,-000, the limit of the uninsured motorist coverage. Interest, however, was allowed by the district court under the terms of the policy only on the amount of $15,000 from the date of the judgment, rather than upon the sum of $32,000, the amount of plaintiff's judgment against Evans, claimed by plaintiff. Bryant v. Liberty Mut. Ins. Co., 282 F.Supp. 229 (E.D.Va. 1968). We affirm.

Walkley E. Johnson, Jr., Norfolk, Va. (Crenshaw, Ware & Johnson, Norfolk, Va., on brief), for appellant.

E. Pryor Wormington, Norfolk, Va. (Rixey & Rixey, Norfolk, Va., on brief), for appellee in No. 12,731, and Harvey E. White, Jr., Norfolk, Va., for appellee in No. 12,732.

Before SOBELOFF, WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

These two appeals arise out of an automobile accident in which plaintiff incurred personal injuries allegedly caused by the negligence of one Daniel W. Evans, who at the time was operating a motor vehicle which had been procured from the Budget Rent-A-Car of Norfolk, Virginia ("Budget"). Plaintiff obtained a judgment against Evans in the sum of $32,000. When the execution issued pursuant to this judgment was returned unsatisfied, plaintiff brought suit against Budget's insurer, Liberty Mutual Insurance Company ("Liberty"). Plaintiff simultaneously commenced an action

–I–

Appellant's principal contention in the action against Liberty is that the district court erred in refusing to direct a verdict for plaintiff because (a) there was no showing of a material failure of cooperation on the part of Evans; (b) the insurance company did not establish due diligence in seeking the insured's cooperation; and (c) a compulsory insurance ordinance of the city of Norfolk renders the defense of non-cooperation ineffective to prevent recovery by plaintiff as a matter of public policy. We shall consider the initial two alleged errors together.

 At the outset, we note our agreement with the district court that under Virginia law, Liberty was required to establish by a preponderance of the evidence that Evans failed in a material manner to comply with the cooperation clause [1] of the insurance policy. See, e.g.,

1. The following conditions are contained within the policy issued by Liberty to Budget: "10. NOTICE OF CLAIM OR SUIT * * * If claim is made or suit is brought against the insured, the insured [the definition of which in-

cludes 'any person while using * * * a hired automobile'] shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." "12. ASSISTANCE AND COOPERA-

Connell v. Indiana Ins. Co., 334 F.2d 993 (4 Cir. 1964); Grady v. State Farm Mut. Auto. Ins. Co., 264 F.2d 519 (4 Cir. 1959); Shipp v. Connecticut Indemnity Co., 194 Va. 249, 72 S.E.2d 343, 348 (1952). The issues thus raised are questions of fact to be determined by the jury. North River Ins. Co. v. Gourdine, 205 Va. 57, 135 S.E.2d 120, 124 (1964); Shipp v. Connecticut Indemnity Co., *supra*. We only state the obvious when we assert that we are without power to redetermine facts found by the jury, e. g., Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 358–359, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962), and that our function is strictly limited to determining the legal question of whether there is any substantial evidence to allow the case to go to the jury. *See, generally,* Moore's Federal Practice ¶¶ 38.05, 38.08 [5] and cases cited therein.

■ Applying these principles, our review of the evidence in the instant case convinces us that there is more than sufficient evidence to support the verdict of the jury.

We need not detail the many facts contained in the record which have been adequately stated by the district court. 282 F.Supp., at 232–233. We only emphasize some of the more salient ones from which the jury properly could have concluded that Evans violated his duty of cooperation with Liberty.

Following the accident involving plaintiff and Evans on January 13, 1966, Evans was arrested but escaped from custody, finally surrendering to police a few days later. Evans did not inform Liberty of the occurrence of the accident, nor did he at any time forward to them any papers connected with the suit which had been served upon him. One J. M. Polasko, an adjuster for Liberty, during the course of his investigation of the accident made a futile attempt to locate Evans by contacting Budget, the police, Evans's wife, and his attorney. Finally, on January 28, Evans telephoned Polasko and discussed the details of the accident freely for approximately thirty minutes. This is the only occasion upon which Evans did discuss the occurrence with Liberty. Evans refused to give a local address, however, and stated that he could be reached only through his attorney.

Liberty, through its attorney, Robert Doumar, sent letters to Evans on February 9, 15, and 22, requesting him to contact the attorney and to forward any papers pertinent to the pending suit instituted by plaintiff. Copies of these letters were sent to various addresses, including those supplied by Evans's attorney, but there was no response, although these letters were later admitted by Evans to have been received by him. About the middle of March, Mr. Doumar discovered that Evans was then incarcerated in the Norfolk city jail. Doumar interviewed Evans twice in the jail, explaining each time to Evans the necessity for his cooperation. Evans, however, initially refused to discuss the

---

TION OF THE INSURED. The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. * * * "

Furthermore, it may be noted that the rental contract signed by Evans when he procured the vehicle involved in the accident from Budget contains the following provision: "8. Renter or driver shall immediately report to Budget in writing if said vehicle shall be involved in any accident, is damaged in any way whatsoever, or is seized or stolen,

and must immediately forward to Budget every process, pleading or paper relating to any and all claims, suits and proceedings received by Renter or driver. Renter agrees to co-operate with Budget and its insurer in all matters connected with the investigation, defense or prosecution of any claim arising out of the operation of the vehicle under this contract." By paragraph 5 of the rental contract, Budget agreed to insure the Renter under a standard public liability policy, the terms and conditions of which were thereby incorporated into the rental contract. Pertinent provisions of this policy have hereinbefore been set forth in this note.

circumstances surrounding the accident until such time as Doumar investigated a pending criminal proceeding involving Evans in the State of Georgia. When informed that a total payment of $415.00 was necessary to extricate Evans from his entanglement with the Georgia authorities, Evans insisted that Liberty and/or Doumar pay this amount. Doumar refused, whereupon Evans adopted the attitude of no payment, no cooperation. Evans reiterated this position in letters to Doumar of March 21 and 22, written from the Norfolk city jail, and also in correspondence of May 13 and June 14 after Evans had been returned to Georgia. Plaintiff aptly describes these letters as "contain[ing] reprehensible implications."

During this period two attempts were made to take Evans's deposition before he was transferred from Norfolk to Georgia. The first time around Evans absolutely refused to discuss the details of the accident, even though he was urged to do so by counsel for Liberty and for Connecticut. On the subsequent attempt, Evans initially refused to discuss the accident, but finally relented when counsel for Connecticut offered to speak with the traffic court judge concerning the criminal aspects of the case. Since Evans had refused to discuss the accident in private with Doumar, the latter did not ask any questions during the taking of the deposition, later explaining that he wanted to avoid surprise answers from an obviously hostile witness.

Even from this brief recital, manifestly, the jury could reasonably have reached the conclusion that Evans flagrantly breached his duty of cooperation with Liberty, in spite of the consistent and diligent efforts of Liberty to secure that cooperation. Its verdict, therefore, will not be disturbed.

–II–

Plaintiff nevertheless urges that the defense of non-cooperation be stricken in the instant case because of the existence of an ordinance of the city of Norfolk which prescribes compulsory insurance for certain vehicles. Plaintiff assumes that rented automobiles fall within the class of vehicles delineated by the ordinance and that, therefore, the public policy to compensate victims who are negligently injured by a vehicle of this class requires that such technical defenses as that of non-cooperation be abrogated.

This issue was not presented to the district court, and Liberty raises the question of the appropriateness of our considering the issue for the first time on review, and devotes a considerable portion of its brief to a discussion of the ancient rule of the common law that courts may not take judicial notice of municipal ordinances.[2] During oral ar-

---

2. The rule proscribing judicial notice of municipal ordinances has been vigorously criticized by the commentators. McCormick, Evidence, § 326, pp. 695–96; Wigmore, Evidence, § 2572, pp. 552–54. See Uniform Rules of Evidence, Rule 9 (2) (3) (judge may, and if furnished by the party with sufficient information must, notice private acts and ordinances and regulations of governmental divisions). Wigmore makes the following observations:

"Of course, these technical quiddities, in the reviewing Court's rulings, refusing to take judicial notice, mean little more than that counsel should have taken care to adduce formal proof of the law or ordinance at the trial below, or at least to have set it forth in the appellate brief. But the curious layman will ask, in most of these cases, why did not the appellate Court send to the law library for the book and be done with the bother of looking up precedents to authorize and excuse not doing so? Or why not, in oral argument, take a recess, until counsel fetched the book and marked the page? Or even (!!!) why not call up both counsel by telephone and peremptorily order 'habeas corpus istius libri'?" Wigmore, *id.*

Nevertheless, many cases support the notion that judicial notice of municipal ordinances may not be taken. E. g., Howard v. United States, 306 F.2d 392 (10 Cir. 1962); Gardner v. Capital Transit Co., 80 U.S.App.D.C. 297, 152 F.2d 288 (1945); Tipp v. District of Columbia, 69 App.D.C. 400, 102 F.2d 264 (1939). *But see*, United States v. Clement, 231 F.Supp. 913 (W.D.La.1964), rev'd on other grounds, 358 F.2d 89 (5

gument, Liberty supplied us with copies of the entire chapter from which the compulsory insurance provisions had been extracted by plaintiff. Our examination of the city ordinances convinces us that the compulsory insurance provisions were not intended to apply to rented automobiles. On this basis, we conclude that there is no legal reason for striking the defense of non-cooperation.[3]

Plaintiff relies upon § 47–6 of the Norfolk City Code which provides in part that "public vehicles shall not be operated or any license issued therefor unless and until the owner has filed with the state corporation commission of Virginia, for each vehicle operated, a liability insurance policy of some liability insurance company authorized to do business in this state * * *." "Public vehicles" are defined in § 47–1(c) as "mean[ing] and includ[ing] taxicabs and for-hire automobiles." Section 47–1(a) defines "for-hire automobiles" as "any seven-passenger or five-passenger motor-driven vehicle or any station wagon used for the *transportation for hire of passengers* * * *." (Emphasis added.)

It is unlikely that a vehicle used "for the transportation for hire of passengers" includes a vehicle simply rented by a private person. The phrase is more customarily employed to denote the business of transporting passengers for hire, such as, by the operation of jitneys or a limousine service, over regular or irregular routes. Examination of the entire chapter (Chapter 47, Taxicabs and Other Vehicles for Hire) satisfies us that it is inapplicable to rented vehicles. For example, before "public vehicles" may be operated in the City of Norfolk a certificate of public convenience and necessity must be procured. Norfolk City Code § 47–2 (1958). Furthermore, once a certificate is issued, the for-hire automobile may not be "loaned, rented, assigned or transferred to any person to operate as such * * *." Norfolk City Code § 47–3(c). Not only would it be highly unusual to require a rent-a-car dealer to obtain certificates of need and convenience; in addition, application of the prohibition against loaning or renting automobiles would be at least obscure if applied to those in the business of renting cars. See, in addition, Norfolk City Code § 47–7: "It shall be unlawful *for any person to operate* in the city *any public vehicle*, unless such person shall be the *owner* of such public vehicle or the *employee* of such owner for the operation of such vehicle." (Emphasis added.)[4] This review of the various provisions of

Cir. 1966); City of Ketchikan, Alaska v. Lot 5, 130 F.Supp. 263, 15 Alaska 518 (1955); Monk v. City of Birmingham, 87 F.Supp. 538 (N.D.Ala.1949), aff'd, 185 F.2d 859 (5 Cir. 1950), cert. den., 341 U.S. 940, 71 S.Ct. 1001, 95 L. Ed. 1367 (1951). See also, United States v. A. L. R. Schechter Poultry Corp., 76 F.2d 617, 623 (2 Cir.), aff'd, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

3. Appellant cites Royal Indemnity Co. v. Olmstead, 193 F.2d 451, 31 A.L.R.2d 635 (9 Cir. 1951), for the proposition that when there is in existence an applicable scheme of compulsory insurance technical defenses such as non-cooperation will not be available to the insurer. In the view we take of the instant case, namely, that the scheme of compulsory insurance existent in the City of Norfolk does not comprehend rented automobiles, we need not reach, nor express any views upon, the issues adjudicated in *Olmstead*.

4. See also, Norfolk City Code § 47–8(a) ("Every person operating one or more public vehicles * * * shall keep and maintain * * * a manifest or written record * * *."); § 47–9 (posting of certificate of public convenience and necessity, rates, etc.; display of rates on outside of vehicle); § 47–18 (for-hire automobile rates; designated rates between specified points); § 47–19 (division of fares among passengers of public vehicles); § 47–22 (prepayment of fares and obligation to transport passengers); § 47–23 (shortest practicable route); § 47–24 (passengers on front seat); § 47–25 (limitation on number of passengers transported); § 47–31 (disposition of property left in vehicles); § 47–36 (requirement of "public vehicle driver's license" before driving vehicle); § 47–38 (posting of driver's license in vehicle, etc.); § 47–42 (license granted only to owners of vehicles or employees thereof).

the Norfolk City Code amply demonstrates that a "for-hire automobile" is a vehicle which is used in the regular business of transporting passengers, is analogous to a taxicab, and includes such devices as jitneys and limousines. More importantly, the various regulatory provisions are quite inconsistent with the normal operation of a rent-a-car agency, even if it could be assumed that a rented car is in some sense a *"public* vehicle." Thus, we conclude that a rented car is not a "public vehicle" within the meaning of the Norfolk city ordinance, and the scheme requiring that compulsory insurance be maintained for such public vehicles is not applicable thereto.

Aside from the question of the applicability of compulsory insurance scheme, which we have decided adversely to plaintiff, there is no basis for abrogating the defense of non-cooperation in the instant case. "Public policy," which we are urged to invoke to achieve a contrary result, is more than a mere incantation which mysteriously dissolves the "technical" defenses of insurance companies. The State of Virginia, whose law we apply, has in no way intimated that all automobile accidents are to be compensable and that technical defenses are to be stricken with a view toward advancing the universality of insurance coverage. Even if this is a desirable goal, Virginia's explicit and consistent recognition of the defense of non-cooperation, *e. g.,* North River Ins. Co. v. Gourdine, 205 Va. 57, 135 S.E.2d 120 (1964); Nationwide Mut. Ins. Co. v. Gentry, 202 Va. 338, 117 S.E.2d 76 (1960), makes it plain that we should not achieve it by judicial fiat.

We have considered plaintiff's other assignments of error, relating primarily to instructions to the jury and the admissibility of certain evidence. These issues were fully explored in the court below, and we perceive no reversible error in that court's resolution of these issues.

–III–

In No. 12,732, plaintiff seeks to recover interest on her judgment against her own insurer, Connecticut. Connecticut concedes that it is liable for interest on the $15,000 jugment which plaintiff obtained under the uninsured motorist provisions of her policy. The district court allowed interest on $15,000, computed from the date of the entry of the final judgment of the Court of Law and Chancery of the City of Norfolk, Virginia, in favor of plaintiff against Daniel W. Evans, and Connecticuit did not appeal. Thus, we construe the judgment as entitling her to interest from that date until actual payment into her hands. Plaintiff asserts, however, that she is entitled to interest on the entire $32,000 judgment which she originally obtained against Evans. For her position plaintiff relies upon the provision of her policy with Connecticut styled "SUPPLEMENTARY PAYMENTS" which obligates the insurer

> "To pay, in addition to the applicable limits of liability:
>
> (a) all expenses incurred by the company, all costs taxed against the insured in any such suit and *all interest on the entire amount of any judgment* therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon." (Emphasis added.)

Connecticut, on the other hand, notes that the foregoing provision is a part of the main body of the liability policy but that plaintiff in the instant case secured her judgment on the basis of a special uninsured motorist endorsement appended to the policy. This endorsement states in part that:

> "none of the insuring Agreements, Exclusions, Conditions or Other Provisions of the policy shall apply to the insurance afforded by this endorsement except the Conditions 'Notice' or 'Notice of Accident,' 'Subrogation,' 'Changes,' 'Assignment,' 'Cancellation' and 'Declarations.'"

Since the endorsement does not specifically incorporate the section concerning "supplementary payments," Connect-

icut, so the argument goes, is not obligated for interest "on the entire amount of * * * [the] judgment" obtained against the uninsured motorist, Evans, but only for such interest as has accrued on the judgment obtained directly against Connecticut under the terms of the uninsured motorist endorsement.

■ We agree with Connecticut and with the district court that the "supplementary payments" proviso does not apply to suits under the uninsured motorist endorsement. In the first instance, we note that under Virginia law an uninsured motorist provision was required to be appended to the policy, but there is no statutory requirement that "supplementary payments" be included therein. Thus, it is entirely consistent with the state statutes for an insurer to provide supplementary payments under the main body of the liability policy but to exclude such payments in the uninsured motorist endorsement. We think this is precisely what Connecticut has done, for the endorsement states quite clearly which provisions of the remainder of the policy are to be incorporated thereinto and which are not. The supplementary payments constitute one of the "Other Provisions of the policy [which] shall [not] apply to the insurance afforded by this [uninsured motorist] endorsement."

■ Furthermore, we agree with Connecticut that the rationale of the supplementary payment provision relating to interest on the entire judgment is the protection of the insured when the insurer decides to contest liability and a judgment in excess of the policy limits is returned against the insured. See, Wilkerson v. Maryland Cas. Co., 119 F. Supp. 383, 388 (E.D.Va.1953), aff'd, 210 F.2d 245 (4 Cir. 1954). This purpose is not served and no other suggests itself when the position of the parties is reversed, as in the instant case, and the insured is not being compelled to pay a judgment.

The judgments in Nos. 12,731 and 12,-732 are

Affirmed.